J-A21025-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                                 :           PENNSYLVANIA
                                                   :
                         v.                            :
                                                   :
                                                   :
SANTOS CASTRO-MOTA             :
                                                   :
                    Appellant             :    No. 221 EDA 2021

Appeal from the PCRA Order Entered December 31, 2020
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0002216-2017

BEFORE: KUNSELMAN, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:               **FILED NOVEMBER 2, 2021**

Appellant Santos Castro-Mota appeals from the order denying his first Post-Conviction Relief Act (PCRA)[1] petition following an evidentiary hearing. Appellant contends that trial counsel was ineffective by failing to file a motion to suppress. We affirm based on the PCRA court's opinion.

We state the facts as presented by the PCRA court:

On January 7, 2017, Officer Brian Bilecki and Corporal Joseph Gansky of the Bensalem Township Police Department were monitoring traffic entering Bensalem Township from the Pennsylvania Turnpike as part of their drug interdiction duties. Both officers have extensive training and experience in investigating the use and distribution of illicit drugs which includes interdiction training. As part of that training, the officers were trained to look for specific indicators of drug activity.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

At approximately 9:14 p.m., the officers observed a light blue Ford van drive through a cash-only tollbooth. After determining that the registration for the vehicle had expired at the end of September the previous year, the officers began to follow the van. As they turned southbound onto Route 1, the officers observed the van driving in reverse on the shoulder of Route 1. The officers stopped their vehicle on the shoulder of the road in front of the van and activated their overhead lights. The van then drove out from behind them, stopped alongside the officers' vehicle in the middle of a lane of traffic and [Appellant] asked for directions. There were two occupants in the vehicle[: Appellant, who was driving, and his co-defendant, Nelson Saldana (Saldana), who was in the front passenger seat]. Officer Bilecki directed them to pull over to the shoulder of the road. The interaction between [Appellant] and the officers was recorded by a mobile video recorder in the officers' patrol car. A redacted version of the audio and visual recording was viewed by the jury.

When Officer Bilecki approached the van, he noted that there was a single key in the ignition. An "overwhelming" odor of air freshener, commonly used to mask the odor of controlled substances, emanated from the van. Air fresheners and laundry detergent were ultimately retrieved from the floor of the van. There was no laundry in the van.

The van was occupied by [Appellant] and Saldana. [Appellant], the driver of the vehicle, is a resident of Brooklyn, New York. Saldana, a resident of Englewood, New Jersey, was seated in the front passenger seat. The van was registered to Beseliane Diaz, at 2957 North 8th Street in North Philadelphia. [Appellant] was asked about the owner of the vehicle and how he had come into possession of it. He was unable to provide any information regarding the owner. He told police that he had the van for approximately a week and that he got it from his friend "Julio." He was unable to provide Julio's last name.

While interacting with [Appellant] and Saldana, the officers walked to the back of the van to consult with each other. After one of those occasions, Officer Bilecki returned to the driver's door and observed [Appellant] talking to someone on a cellular "flip" phone while holding a cellular "smart" phone in his other hand.

While speaking to police, [Appellant] gave inconsistent accounts of his previous whereabouts. [Appellant] first asserted that he

- 2 -

and Saldana were returning from spending two or three days in Amboy, New Jersey with [Appellant's] mother. When he was asked for her address, he told the officers that he did not know her address. [Appellant] next told police that he had just returned from Harrisburg where he was looking at a motorcycle he was considering buying from a friend. He stated that he then received a call to pick up Saldana at the King of Prussia Mall. When he was asked what his passenger's name was and how he knew him, [Appellant] struggled to answer. [Appellant] ultimately stated that he met Saldana in Philadelphia two days prior but could not explain how that "connection occurred." [Appellant] told police that Saldana lived off the Boulevard in the area of Wyoming Avenue in Philadelphia which contradicted the information Saldana had provided police.

Officer Bilecki testified that, after the van was stopped, he had several discreet interactions with [Appellant] during which he questioned [Appellant]. He testified that during his first and second interactions, [Appellant] had no difficulty responding to his questions and answering in English. When he questioned him a third time, [Appellant] began to indicate for the first time that he did not fully understand what he was being asked.

Based on a number of indicators of drug activity, the officers called for a K-9 officer to respond to the scene. [*See, e.g.*, N.T. Trial, 6/27/18, at 34 (noting Route 1 is a drug trafficking corridor), 116, 135-36 (police testifying as to indicators of reasonable suspicion of drug trafficking at time of stop, including the aforementioned testimony).] After the K-9 officer arrived, but before the K-9 search was conducted, backup Officer Kevin Howard found a black plastic bag on the ground outside the passenger side of the van. Inside the black bag was a clear plastic bag containing a suspected controlled substance[, specifically 78.02 grams of a mixture of heroin, fentanyl and/or furanylfentanyl. At trial, the Commonwealth presented testimony that the 78.02 grams "would be repackaged for sale, resulting in 2,496 individual bags or 178 bundles with a minimum street value of approximately $13,350."]

A K-9 search of the outside of the van was then conducted. The dog, trained to alert when an odor of controlled substance is detected, alerted on both the driver and front passenger's door. A K-9 search was conducted of the interior of the van after the vehicle was towed to the Bensalem Township Police Department. During that search, the dog alerted on the floor in between the

two front captain's chairs, on the floor boards between and behind the front, passenger captain's chair, on the seat of the front, passenger captain's chair and on the third row of seats at the rear of the van.

The following items were on [Appellant's] person: the two cellular telephones he was using during the vehicle stop, two SIM cards found in his wallet, and $500 in U.S. currency. The following items were on Saldana's person: $2,800 in U.S. currency secured with what was described as a rubber band commonly used to secure bundles of heroin and a set of car keys which did not belong to the van. [Appellant] and Saldana were taken into custody at the scene of the vehicle stop. They were transported to the Bensalem Township Police Department where they were interviewed by Officer Felix Adorno, a Spanish-speaking officer. [Appellant] made one statement. He told Officer Adorno, "You got nothing on me."

Neither the previous registered owner of the van nor "Julio" ever made any attempt to retrieve the van.

PCRA Ct. Op., 5/4/21, at 3-6 (citations omitted and formatting altered).

On July 29, 2018, a jury found Appellant guilty of "possession with intent to deliver a controlled substance, criminal conspiracy, and use and/or possession with intent to use drug paraphernalia." *Id.* at 1. On July 5, 2018, the trial court sentenced Appellant to five to ten years' imprisonment. Appellant appealed to this Court, which affirmed on July 1, 2019. *Commonwealth v. Castro-Mota*, 2019 WL 2745554 (Pa. Super. filed July 1, 2019) (unpublished mem.).

On July 9, 2019, the PCRA court docketed Appellant's timely *pro se* PCRA petition. The PCRA court appointed PCRA counsel, who filed an amended PCRA petition on December 17, 2019, which claimed that trial counsel was

ineffective by not challenging the extended nature of the stop and by not moving to suppress the evidence. Am. PCRA Pet., 12/17/19.

On August 18, 2020, the PCRA court held an evidentiary hearing at which Appellant and Appellant's trial counsel, Patrick McMenamin, Esq., both testified. In relevant part, trial counsel testified that he did not file a motion to suppress because, in his view, there was not a substantial delay between the time of the stop and the K-9 search at the traffic stop.[2] N.T. PCRA Hr'g, 8/18/20, at 31-32. The PCRA court denied Appellant's petition on December 31, 2020. Order, 12/31/20. Appellant timely appealed, and the PCRA court did not order Appellant to comply with Pa.R.A.P. 1925(b), but filed a responsive opinion.

Appellant raises a single issue: "Whether the PCRA court erred by denying [Appellant's] petition for post-conviction relief?" Appellant's Brief at 5.

Initially, Appellant "does not challenge the [police officer's] initial decision to effectuate" the stop for the expired registration. *Id.* at 12. Appellant, however, argues that the record did not establish the police had

---

[2] Trial counsel testified that twenty-one minutes elapsed from the time of the stop to the time of the K-9 search. N.T. PCRA Hr'g at 31. The PCRA court states that the video recording of the stop established that thirty-six minutes elapsed between the time of the stop and the time of the search. PCRA Ct. Op. at 13. The video recording, which the trial court admitted at Appellant's trial, was transmitted to this Court as part of the certified record.

reasonable suspicion to extend the traffic stop and question Appellant and his codefendant on matters unrelated to the stop. *Id.* at 13, 16 (citing, *inter alia*, ***Commonwealth v. Dales***, 820 A.2d 807 (Pa. Super. 2003)). Appellant asserts that regardless of whether he established a reasonable expectation of privacy in the van, the drugs were abandoned as a direct result of an unconstitutional extended stop. *Id.* at 18-19. Appellant reasons that because the extended stop was unconstitutional, the results of the K-9 search should be suppressed. *Id.* at 20-21. Appellant concludes that because he was convicted only because of the seized drugs, he would have been acquitted if trial counsel had filed a motion to suppress. *Id.* at 22.

We state the following as guidance:

Our standard of review from the denial of a PCRA petition is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error. The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions.

We presume that the petitioner's counsel was effective. To establish a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

The burden is on the defendant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. Moreover, a failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness.

The prejudice standard for an ineffectiveness claim is a higher standard than the harmless error analysis typically applied when assessing allegations of trial court error. Instead, a petitioner must prove actual prejudice, which our Supreme Court has defined as follows:

A reasonable probability that, but for counsel's lapse, the result of the proceeding would have been different. In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Ultimately, a reviewing court must question the reliability of the proceedings and ask whether the result of the particular proceeding was unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

*Commonwealth v. Campbell*, --- A.3d ---, ---, 2021 WL 3889960, *3 (Pa. Super. 2021) (citations omitted and formatting altered).

In *Commonwealth v. Shabezz*, 166 A.3d 278 (Pa. 2017), our Supreme Court explained standing in the context of a suppression motion as follows:

Generally, to have standing to pursue a suppression motion under Pa.R.Crim.P. 581, the defendant's own constitutional rights must have been infringed. However, it is well settled that a defendant charged with a possessory offense in this Commonwealth has automatic standing because the charge itself alleges an interest sufficient to support a claim under Article I, § 8. This rule entitles a defendant to a review of the merits of his suppression motion without a preliminary showing of ownership or possession in the premises or items seized. In addition to standing, though, a defendant must show that he had a privacy interest in the place invaded or thing seized that society is prepared to recognize as reasonable.

While cursorily similar, standing and privacy interests are different concepts serving different functions. Standing is a legal interest

that empowers a defendant to assert a constitutional violation and thus seek to exclude or suppress the government's evidence pursuant to the exclusionary rules under the Fourth Amendment to the United States Constitution or Article 1, Section 8 of the Pennsylvania Constitution. It ensures that a defendant is asserting a constitutional right of his own. The expectation of privacy is an inquiry into the validity of the search or seizure itself; if the defendant has no protected privacy interest, neither the Fourth Amendment nor Article I, § 8 is implicated. In essence, while a defendant's standing dictates when a claim under Article I, § 8 may be brought, his privacy interest controls whether the claim will succeed—once a defendant has shown standing, he must, in short, having brought his claim, demonstrate its merits by a showing of his reasonable and legitimate expectation of privacy in the premises.

*Shabezz*, 166 A.3d at 286-87 (citations omitted and formatting altered).

Ordinarily, a defendant has no reasonable and legitimate privacy interest in voluntarily abandoned evidence. *Commonwealth v. Ibrahim*, 127 A.3d 819, 825 (Pa. Super. 2015). However, if the causative factor in the abandonment of the evidence at issue "was the unlawful and coercive" seizure of the defendant, then the evidence should be suppressed. *Commonwealth v. Matos*, 672 A.2d 769, 774 (Pa. 1996); *Commonwealth v. Pollard*, 299 A.2d 233, 236 (Pa. 1973) (holding that "[a]lthough abandoned property may normally be obtained and used for evidentiary purposes by the police, such property may not be utilized where the abandonment is coerced by unlawful police action" (footnote omitted)).

In *In Interest of A.A.*, 195 A.3d 896 (Pa. 2018), our Supreme Court addressed whether the traffic stop at issue was unlawful and coercive, specifically, "whether information obtained by a police officer during a lawful

initial traffic stop may be used to justify re-engagement with the driver after the police officer indicates the driver is free to go, such that [the defendant's] consent to search given during that re-engagement is valid." **A.A.**, 195 A.3d at 898.

In resolving that issue, the **A.A.** Court summarized **Rodriguez v. United States**, 575 U.S. 348 (2015), in which the police stopped the defendant for a traffic violation, but "[a]fter conducting 'all the business' of the stop, including running a records check, asking [the defendant] several questions, and issuing [the defendant] a warning, the officer conducted a canine sniff of [the defendant's] vehicle," which resulted in a drug seizure. **Id.** at 905. The **A.A.** Court summed up the **Rodriguez** Court's reasoning in vacating the lower court's decision:

> A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation. The High Court also stated an officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual. As such, the [High] Court remanded the case to the Eighth Circuit to consider whether reasonable suspicion of criminal activity justified detaining [the defendant] beyond completion of the traffic infraction investigation.

**Id.** (citations omitted and formatting altered).

The **A.A.** Court also discussed **Commonwealth v. Freeman**, 757 A.2d 903 (Pa. 2000):

The **Freeman** Court recognized that, in order to be a valid investigative detention during which consent to search might be properly obtained, the seizure must be justified by an articulable, reasonable suspicion that [the defendant] may have been engaged in criminal activity **independent of that supporting her initial detention** (the reason she was pulled over in the first place) and this question must be answered by examining **the totality of the circumstances**. It is clear the Court considered [the defendant's] concealment of the fact she was traveling with the other vehicle to be inadequate to provide reasonable suspicion for a second detention and there were no other facts to support any such suspicion, beyond the initial observations which led to the traffic stop in the first place. The [**Freeman**] Court explained [that] in particular, there was no testimony that the actions of [the defendant] and her companions were consistent with those of drug dealers or criminals of any other type; that their route was heavily traveled by drug dealers; or, indeed, that the trooper suspected [the defendant] of drug dealing or any other specific crime. Such information would have contributed to reasonable suspicion clearly based on the totality of the circumstances, including any information gleaned during the initial traffic stop. . . .

Most importantly . . . **Freeman** does not stand for the proposition that information lawfully obtained during an initial traffic stop cannot be used to support the requisite suspicion for a second detention after a break in contact, simply because such information was not present in that case. Furthermore, our reading of **Freeman** comports with, and is supported by, the **Rodriguez** decision. **See Rodriguez**, [575 U.S. at 355] (officer may prolong traffic stop so long as "reasonable suspicion ordinarily demanded to justify detaining an individual" is present).

Accordingly, we confirm that all relevant facts and the whole picture necessarily includes any information learned by a police officer during an initial lawful traffic stop, irrespective of whether or not the officer suggests at some point during that stop that the subject of the stop is free to leave or tells him or her to have a good night. Unlike in **Freeman**, here it is clear based on the totality of circumstances derived from the initial stop — which included the odor of marijuana noted by [the police] along with his observations of [the defendant's] sluggish and confused appearance and [the passenger's] furtive movements — that he

- 10 -

had reasonable suspicion to conduct a second detention of [the defendant].

*Id.* at 910 (emphases in original, some citations omitted, and formatting altered).

In ***Dales***, the police conducted a traffic stop of the defendant's vehicle for excessive tinted windows and wrote the defendant a warning slip. ***Dales***, 820 A.2d at 810. At the time of the stop, the police noticed "(1) there was a smell of bactine[, an antiseptic spray,] emanating from [the d]efendant's vehicle; (2) there were several air fresheners in the vehicle; and (3) [the d]efendant appeared nervous." *Id.* at 815. The defendant produced the appropriate license, registration, and insurance documents to the police. *Id.* at 810. After the police returned the documents, the police questioned the defendant further, who gave inconsistent responses. *Id.* at 811. As a result, the defendant consented to a search of the vehicle, and the police recovered illegal narcotics. *Id.* In short, the trial court granted the defendant's suppression motion, and the Commonwealth appealed. *Id.* at 811-12. The ***Dales*** Court affirmed because the police did not articulate "a reasonable suspicion to support the continued detention of [the defendant] once the purpose of the initial traffic stop had ended." *Id.* at 814-15. Having summarized the applicable law, we address Appellant's issue.

Instantly, Appellant questions whether the police had reasonable suspicion of criminal activity to extend the traffic stop but does not challenge the initial stop that was based on Appellant's expired vehicle registration. ***See***

Appellant's Brief at 12-13. Firstly, Appellant has standing because he was charged with a possessory offense. *See Shabezz*, 166 A.3d at 286-87. Generally, on these facts, Appellant would not have an expectation of privacy if he abandoned the drugs, but because suppression would be warranted if unlawful police action resulted in the abandonment of the contraband, we will examine the legality of the traffic stop. *See Matos*, 672 A.2d at 774; *Pollard*, 299 A.2d at 236.

Here, after careful review of the record, the parties' briefs, and the PCRA court's decision, we agree with the PCRA court's reasoning that under the totality of the circumstances, the police had "reasonable suspicion that Appellant may have been engaged in criminal activity **independent of that supporting** his **initial detention** (the reason he was pulled over in the first place)." *See A.A.*, 195 A.3d at 910 (emphasis in original and formatting altered); *see also* PCRA Ct. Op. at 3-6, 11-18. Specifically, when Officer Bilecki approached Appellant's van to resolve the reason Appellant "was pulled over in the first place," *i.e.*, the expired registration, Officer Bilecki testified about numerous indicators of drug trafficking, including a single key in the ignition, overwhelming odor of air freshener, inability to produce the vehicle registration, third-party ownership of the vehicle, and inconsistent answers by Appellant and his passenger. *See* PCRA Ct. Op. at 3-6, 11-18; *accord, e.g.*, N.T. Trial, 6/27/18, at 34, 116, 135-36; *see also A.A.*, 195 A.3d at 910. Unlike the police in *Freeman*, Officer Bilecki testified that the actions of

- 12 -

Appellant and his passenger were consistent with those of drug traffickers, their route was a drug trafficking corridor, and he suspected Appellant of transporting drugs. **Compare, e.g.**, N.T. Trial, 6/27/18, at 34, 116, 135-36, **with Freeman**, 757 A.2d at 908.

For those reasons, we also disagree with Appellant's reliance on **Dales** because unlike the police in **Dales**, Officer Bilecki testified to more than just the odor and sight of several air fresheners, and that the defendant appeared nervous. **Cf. Dales**, 820 A.2d at 815. We agree with the PCRA court that because Appellant failed to establish an improper traffic stop, he has no basis to challenge the seizure of the abandoned drugs. **See** PCRA Ct. Op. at 18; **Matos**, 672 A.2d at 774; **Ibrahim**, 127 A.3d at 825. In sum, because we agree with the PCRA court that Appellant failed to establish that this claim had arguable merit, no relief is due. **See Campbell**, 2021 WL 3889960 at *3.

Order affirmed.

President Judge Emeritus Stevens joins the memorandum.

Judge Kunselman concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/02/2021

- 13 -

**IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA : No.   CP-09-CR-0002216-2017

v.                   :     [221 EDA 2021]

SANTOS CASTRO-MOTA        :

## OPINION

Petitioner, Santos Castro-Mota, appeals from this Court's order dated December 31, 2020, denying his request for relief pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.*, following a hearing held on August 18, 2020.

### Procedural and Factual History

On June 29, 2018, following a joint trial by jury, Petitioner and his co-defendant, Nelson Saldana ("Saldana"), were convicted of possession with intent to deliver a controlled substance, 35 Pa.C.S. § 780-113(a)(30), criminal conspiracy, 18 Pa.C.S. § 903, and use and/or possession with intent to use drug paraphernalia, 35 Pa.C.S. § 780-113(a)(32). The controlled substances involved, 78.02 grams of a mixture of heroin, fentanyl and/or furanylfentanyl, were found abandoned on the side of the road during a vehicle stop conducted by Bensalem Township police on January 7, 2017. N.T., Trial, 6/27/18, at 167-68; N.T., Trial, 6/28/18, at 203-206; Trial Exhibits C-13, C-15. The vehicle was being operated by Petitioner. Saldana, the only other occupant, was seated in the front passenger seat. N.T., Trial, 6/27/18, at 46-48; Trial Exhibit C-2. Detective Timothy Carroll of the Bucks County District Attorney's Office testified as an expert in the use and distribution of illicit drugs. Detective Carroll testified that 78 grams of the controlled substance mixture would be repackaged for sale, resulting in 2,496 individual bags or 178 bundles



with a minimum street value of approximately $13,350. N.T., Trial, 6/28/18, at 327-28. Based on the amount of the controlled substances, the fact that the controlled substances were packaged in bulk and the lack of any use paraphernalia, Detective Carroll testified that it was his expert opinion that the controlled substances were possessed with the intent to deliver. N.T., Trial, 6/28/18, at 328-30.

On July 5, 2018, Petitioner was sentenced to a term of incarceration of five to ten years with a consecutive term of five years probation. On July 13, 2018, Petitioner filed a Notice of Appeal. On July 1, 2019, the judgment of sentence was affirmed. Petitioner did not file a Petition for Allowance of Appeal. The judgment of sentence therefore became final on July 31, 2019.

On July 9, 2019, Petitioner filed a timely *pro se* petition for post-conviction relief. On July 11, 2019, counsel was appointed to represent Petitioner. On December 17, 2019, PCRA counsel filed an Amended Petition for Post-Conviction Collateral Relief ("Amended Petition"). On January 15, 2020, the Commonwealth filed an answer to the Amended Petition. On August 18, 2020, an evidentiary hearing was held. At the conclusion of the hearing, the parties were directed to file briefs. By order dated December 31, 2020, Petitioner's Amended Petition was denied.

### Analysis

To obtain PCRA relief, a petitioner must plead and prove by a preponderance of the evidence that his conviction resulted from one or more of the enumerated grounds for relief set forth in 42 Pa.C.S. § 9543(a). Commonwealth v. Reid, 99 A.3d 470, 481 (Pa. 2014). Petitioner relies on 42 Pa.C.S. §9543(a)(2)(ii), ineffective assistance of counsel, as his sole basis for relief.

The standards applicable to claims of ineffective assistance of counsel are well established. Counsel is presumed to be effective and the burden is on the petitioner to prove otherwise. Commonwealth v. Smith, 17 A.3d 873, 883 (Pa. 2011). To prevail on an ineffectiveness claim,

2

the petitioner must satisfy, by a preponderance of the evidence, the performance and prejudice standard set forth in Strickland v. Washington, 466 U.S. 668 (1944). Commonwealth v. Cousar, 154 A.3d 287, 296 (Pa. 2017). Specifically, the petitioner must establish:

> (1) that the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) that, but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. Commonwealth v. Pierce, 567 Pa. 186, 786 A.2d 203, 213 (2001).

Commonwealth v. Spotz, 896 A.2d 1191, 1209-10 (Pa. 2006). The petitioner bears the burden of proving all three prongs of this test. Commonwealth v. Watley, 153 A.3d 1034, 1040 (Pa.Super. 2016). Where the petitioner's evidence fails to establish any of the three distinct prongs of the ineffective assistance of counsel test, the claim may be disposed of on that basis alone, without a determination of whether the other two prongs have been met. Commonwealth v. Basemore, 744 A.2d 717, 738 n.23 (Pa. 2000). "Moreover, a court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; if a claim fails under any necessary element of the Strickland test, the court may proceed to that element first." Cousar, 154 A.3d at 297.

Petitioner asserts that trial counsel was ineffective for failing to file a motion to suppress the evidence obtained by police after they stopped the vehicle Petitioner was driving on January 7, 2017.[1] The facts and circumstances surrounding the vehicle stop were summarized as follows for purposes of direct appeal:

> On January 7, 2017, Officer Brian Bilecki and Corporal Joseph Gansky of the Bensalem Township Police Department were monitoring traffic entering Bensalem Township from the

---

[1] Petitioner was represented by Keith J. Williams, Esquire during pretrial motions, trial, and on appeal. Prior to his representation of Petitioner, Mr. Williams had been practicing criminal law for over thirty years. Mr. Williams is in private practice. Approximately eighty to eighty-five percent of his practice is criminal defense. N.T., PCRA Hearing, 8/18/20, at 36.

3

Pennsylvania Turnpike as part of their drug interdiction duties. N.T. 6/27/18 at 36-38. Both officers have extensive training and experience in investigating the use and distribution of illicit drugs which includes interdiction training. N.T. 6/27/18 at 24-26; N.T. 6/28/18 at 220-25. As part of that training, the officers were trained to look for specific indicators of drug activity. N.T. 6/27/18 at 26-36; N.T. 6/28/18 at 223-24.

At approximately 9:14 p.m., the officers observed a light blue Ford van drive through a cash-only tollbooth. N.T. 6/27/18 at 38-39. After determining that the registration for the vehicle had expired at the end of September the previous year, the officers began to follow the van. N.T. 6/27/18 at 39-41; Ex. C-1. As they turned southbound onto Route 1, the officers observed the van driving in reverse on the shoulder of Route 1. N.T. 6/27/18 at 42-43. The officers stopped their vehicle on the shoulder of the road in front of the van and activated their overhead lights. N.T. 6/27/18 at 44. The van then drove out from behind them, stopped alongside the officers' vehicle in the middle of a lane of traffic and [the operator] asked for directions. N.T. 6/27/18 at 45-46. There were two occupants in the vehicle. N.T. 6/27/18 at 46-48; Ex. C-2. Officer Bilecki directed them to pull over to the shoulder of the road. N.T. 6/27/18 at 46, 50. The interaction between [Petitioner] and the officers was recorded by a mobile video recorder in the officers' patrol car. A redacted version of the audio and visual recording was viewed by the jury. See Ex. C-5.

When Officer Bilecki approached the van, he noted that there was a single key in the ignition. N.T. 6/27/18 at 53. An "overwhelming" odor of air freshener, commonly used to mask the odor of controlled substances, emanated from the van. N.T. 6/27/18 at 30, 53. Air fresheners and laundry detergent were ultimately retrieved from the floor of the van. N.T. 6/27/18 at 55; Ex. C-3. There was no laundry in the van. N.T. 6/27/18 at 57.

The van was occupied by [Petitioner] and Saldana. N.T. 6/27/18 at 46-48; Ex. C-2. [Petitioner], the driver of the vehicle, is a resident of Brooklyn, New York. N.T. 6/27/18 at 47-48, 57, 59; Ex. C-4. Saldana, a resident of Englewood, New Jersey, was seated in the front passenger seat. N.T. 6/27/18 at 47-48, 153; Ex. C-7. The van was registered to Beseliane Diaz, at 2957 North 8th Street in North Philadelphia. N.T. 6/27/18 at 123; Ex. C-1. [Petitioner] was asked about the owner of the vehicle and how he had come into possession of it. He was unable to provide any information regarding the owner. N.T. 6/27/18 at 113-14. He told police that he had the van for approximately a week and that he got it from his friend "Julio."

4

N.T. 6/27/18 at 158. He was unable to provide Julio's last name. N.T. 6/27/18 at 114.

While interacting with [Petitioner] and Saldana, the officers walked to the back of the van to consult with each other. After one of those occasions, Officer Bilecki returned to the driver's door and observed [Petitioner] talking to someone on a cellular "flip" phone while holding a cellular "smart" phone in his other hand. N.T. 6/27/18 at 130; Exs. C-8, C-9.

While speaking to police, [Petitioner] gave inconsistent accounts of his previous whereabouts. [Petitioner] first asserted that he and Saldana were returning from spending two or three days in Amboy, New Jersey with [Petitioner's] mother. When he was asked for her address, he told the officers that he did not know her address. N.T. 6/27/18 at 62. [Petitioner] next told police that he had just returned from Harrisburg where he was looking at a motorcycle he was considering buying from a friend. N.T. 6/27/18 at 155. He stated that he then received a call to pick up Saldana at the King of Prussia Mall. N.T. 6/27/18 at 62-63. When he was asked what his passenger's name was and how he knew him, [Petitioner] struggled to answer. N.T. 6/27/18 at 159. [Petitioner] ultimately stated that he met Saldana in Philadelphia two days prior but could not explain how that "connection occurred." N.T. 6/27/18 at 159. [Petitioner] told police that Saldana lived off the Boulevard in the area of Wyoming Avenue in Philadelphia which contradicted the information Saldana had provided police. N.T. 6/27/18 at 153.

Officer Bilecki testified that, after the van was stopped, he had several discreet interactions with [Petitioner] during which he questioned [Petitioner]. He testified that during his first and second interactions, [Petitioner] had no difficulty responding to his questions and answering in English. When he questioned him a third time, [Petitioner] began to indicate for the first time that he did not fully understand what he was being asked. N.T. 6/27/18 at 137-38.

Based on a number of indicators of drug activity, the officers called for a K-9 officer to respond to the scene. After the K-9 officer arrived, but before the K-9 search was conducted, backup Officer Kevin Howard found a black plastic bag on the ground outside the passenger side of the van. N.T. 6/28/18 at 203-06; Ex. C-12. Inside the black bag was a clear plastic bag containing a suspected controlled substance. N.T. 6/27/18 at 161, 163; Ex. C-13.

5

A K-9 search of the outside of the van was then conducted. The dog, trained to alert when an odor of controlled substance is detected, alerted on both the driver and front passenger's door. N.T. 9/28/18 at 126-28. A K-9 search was conducted of the interior of the van after the vehicle was towed to the Bensalem Township Police Department. During that search, the dog alerted on the floor in between the two front captain's chairs, on the floor boards between and behind the front, passenger captain's chair, on the seat of the front, passenger captain's chair and on the third row of seats at the rear of the van. N.T. 6/28/18 at 130-31, 134-35, 139-40.

\*\*\*

The following items were on [Petitioner's] person: the two cellular telephones he was using during the vehicle stop, two SIM cards found in his wallet, and $500 in U.S. currency. N.T. 6/27/18 at 143; Exs. C-10, C-11; N.T. 6/28/18 at 43-44. The following items were on Saldana's person: $2,800 in U.S. currency secured with what was described as a rubber band commonly used to secure bundles of heroin and a set of car keys which did not belong to the van. N.T. 6/27/18 at 119, 121, 183; Exs. C-6, C-18.

[Petitioner] and Saldana were taken into custody at the scene of the vehicle stop. Ex. C-5. They were transported to the Bensalem Township Police Department where they were interviewed by Officer Felix Adorno, a Spanish-speaking officer. N.T. 6/28/18, [at] 86, 147-50. [Petitioner] made one statement. He told Officer Adorno, "You got nothing on me." N.T. 6/28/18 at 166.

\*\*\*

Neither the previous registered owner of the van nor "Julio" ever made any attempt to retrieve the van. N.T. 6/27/18 at 194.

Opinion, Direct Appeal, at 1-5.

Petitioner does not challenge the legality of the initial traffic stop. N.T., PCRA Hearing, 8/18/20, at 6. Section 1301 of the Vehicle Code provides:

(a) Driving unregistered vehicle prohibited. — No person shall drive or move and no owner or motor carrier shall knowingly permit to be driven or moved upon any highway any vehicle which is not registered in this Commonwealth unless the vehicle is exempt from registration.

6

75 Pa.C.S. § 1301(a). The uncontradicted evidence established that the vehicle Petitioner was driving was not registered at the time Petitioner was stopped by police.[2] Commonwealth Exhibit PCRA-1. Petitioner's claim for PCRA relief is based on the assertion that he was unlawfully detained following the valid traffic stop. He asserts that trial counsel was ineffective for failing to file a motion to suppress the evidence obtained by police as a result of his alleged unlawful detention. Amended Petition, 12/17/19, at ¶ 11.

To obtain PCRA relief based on ineffective assistance of counsel for failing to file a motion to suppress, a petitioner is required to establish that the suppression motion would have been meritorious. Commonwealth v. Johnson, 179 A.3d 1153, 1160 (Pa.Super. 2018) ("Where a defendant alleges that counsel ineffectively failed to pursue a suppression motion, the inquiry is whether the failure to file the motion is itself objectively unreasonable, which requires a showing that the motion would be meritorious."). "A defendant moving to suppress evidence has the preliminary burden of establishing standing *and a legitimate expectation of privacy.*" Commonwealth v. Burton, 973 A.2d 428, 435 (Pa.Super. 2009) (*en banc*) (emphasis added). Where a possessory offense is charged, the defendant has "automatic standing because the charge itself alleges an interest sufficient to support a claim under Article I, § 8." Commonwealth v. Enimpah, 106 A.3d 695, 698 (Pa. 2014) (citation, quotation marks and brackets omitted). Regarding the separate issue of whether a defendant has a legitimate expectation of privacy, a defendant must show that he or she "had a privacy interest in the place invaded or thing seized that society is prepared to recognize as reasonable." Id. "[I]f the defendant has no protected privacy

---

[2] At the PCRA hearing and in his Memorandum of Law submitted after the hearing, Petitioner referred to the fact that he was never cited for driving an unregistered vehicle. He has failed, however, to explain how the officers' failure to issue a citation at the scene or to charge the summary Vehicle Code violation in the criminal complaint is relevant given the fact that he did not challenge the initial car stop in his amended PCRA petition and there is no dispute that the vehicle registration was expired.

7

interest, neither the Fourth Amendment not Article 1, § 8 is implicated." Id. at 699.

In the instant case, Petitioner was charged with a possessory offense. He therefore would have had automatic standing to file a motion to suppress. However, Petitioner has failed to meet his burden of proving that he had an expectation of privacy in the van he was driving so as to establish his right to contest the search of the van. The mere fact that a defendant is operating a motor vehicle will not, without more, sustain a finding that the operator had a reasonable expectation of privacy in the operated vehicle where other evidence suggests he or she had no such reasonable expectation of privacy. Commonwealth v. Newman, 84 A.3d 1072, 1078 (Pa.Super. 2014) (citing Commonwealth v. Burton, 973 A.2d 428 (Pa.Super. 2009) and Commonwealth v. Cruz, 21 A.3d 1247 (Pa.Super. 2011)). Here, the evidence suggests that Petitioner did not have a reasonable expectation of privacy. Specifically, the evidence established that Petitioner was not the owner of the van. The van, a 1999 Ford Econoline bearing PA registration JYN-6455, had been registered to Beseliane Diaz, at 2957 North 8th Street in North Philadelphia and that registration had expired months before the van was stopped by police.[3] N.T., Trial, 6/27/18, at 123; Trial Exhibit C-1; Commonwealth Exhibit PCRA-1. The registered owner and the occupants did not reside in the same region; Ms. Diaz was a resident of Philadelphia; Petitioner was a resident of Brooklyn, New York (N.T., Trial, 6/27/18, at 47-48, 57, 59; Trial Exhibit C-4); and Saldana was a resident of Englewood, New Jersey. N.T., Trial, 6/27/18, at 47-48, 153; Trial Exhibit C-7. Neither of the occupants were shown to be related to Ms. Diaz. At the time of the traffic stop, Petitioner had only a single key for the vehicle and was unable to provide any information regarding the owner. N.T., Trial, 6/27/18, at 53, 113-14. He told police that he had the van for

---

[3] The only documentary evidence as to ownership was contained in a copy of the response of the Pennsylvania Bureau of Motor Vehicle response to the police inquiry regarding registration of the vehicle which was introduced by the Commonwealth at trial and at the PCRA hearing. Exhibit C-1; Commonwealth Exhibit PCRA-1.

8

approximately a week and that he got it from his friend "Julio" but was unable to provide Julio's last name. N.T., Trial, 6/27/18, at 114, 158. At no time during his interaction with police did Petitioner mention Beseliane Diaz or in any way indicate that he or "Julio" had her permission to use the vehicle. Neither the previous registered owner, Ms. Diaz, or "Julio" sought to retrieve the van after it was taken into police custody. N.T., Trial, 6/27/18, at 194-95.

Petitioner did not call either Ms. Diaz or "Julio" as a witness at the PCRA hearing. The only evidence Petitioner presented regarding permission to operate the vehicle was the following brief reference during his direct testimony:

> Q. Who owned the van that you were driving?
>
> A. Julio's wife, my friend Julio's wife. I believe her name is Gialina (ph).
>
> Q. Were you borrowing the vehicle?
>
> A. Correct. He lent it to me.

N.T., PCRA Hearing, 8/18/20, at 11.

This Court did not find Petitioner's PCRA testimony to be credible given the facts and circumstances set forth above. However, even if his testimony is accepted as true, it is insufficient to establish that he had permission to operate the vehicle from the registered owner or from any other person authorized to give such permission. Petitioner did not offer any evidence that Ms. Diaz gave him permission to operate the vehicle. He also failed to establish "Julio's" identity. Assuming arguendo that "Julio" and Ms. Diaz were in fact married at that time, that fact alone does not establish that "Julio" had any authority to give Petitioner or anyone else permission to drive Ms. Diaz's van. See Commonwealth v. Maldonado, 14 A.3d 907, 911 (Pa.Super. 2011) ("The fact that Maldonado and Vasquez [the owner of the vehicle] might have lived together and had a romantic relationship does not foreclose the possibility that Maldonado was driving

9

Vasquez's vehicle without her knowledge or permission. For that reason, we conclude that Maldonado failed to establish an expectation of privacy in the vehicle he was driving...."). Viewing the record as a whole, Petitioner failed to establish that he had permission from the vehicle owner to operate the van. Since Petitioner did not own the van and he has not shown authority to operate the van, he failed to establish that he had a cognizable expectation of privacy in that vehicle. See Burton, 973 A.2d at 436. Trial counsel cannot be deemed ineffective for failing to file a motion to suppress evidence seized from the van where Petitioner failed to meet his preliminary burden of establishing his right to challenge the search of that vehicle.

Petitioner also failed to meet his burden of proving that he had an expectation of privacy in the drugs that were ultimately found abandoned on the side of the roadway so as to establish his right to contest the seizure of those drugs. At the PCRA hearing, Petitioner testified that those drugs were never in his possession, were never possessed by Saldana and were never in the van. N.T., PCRA Hearing, 8/18/20, at 12-13. He testified that two other men were walking in the area at the time of the traffic stop, that police found a black bag containing the drugs "far, far, far from the van" and that a police officer later placed the black bag with the drugs into Saldana's bag. N.T., PCRA Hearing, 8/18/20, at 11-12. Assuming *arguendo* that Petitioner had a possessory interest and a reasonable expectation of privacy in the bag seized by police despite his claim that the drugs belonged to someone else, Petitioner's reasonable expectation of privacy was lost prior to the search since the only reasonable inference that can be drawn from the evidence is that Petitioner and Saldana did in fact possess the drugs and chose to voluntarily abandoned them during the traffic stop.[4] A person who voluntarily abandons property also voluntarily relinquishes

---

[4] Snow and/or freezing rain was falling during the majority of the stop. N.T., Trial, 6/27/18, at 144. The area adjacent to the passenger side of the vehicle was covered in snow. N.T., Trial, 6/28/18, at 195. Police examined this area and did not notice anything other than their own footprints. N.T., Trial, 6/28/18, at 195-96. Police returned to their patrol vehicle and upon returning to the passenger side of the van they observed the black plastic bag containing the drugs

10

any expectation of privacy. See Commonwealth v. Shoatz, 366 A.2d 1216, 1220 (Pa. 1976) (where two of three suspects dropped their suitcases and all three suspects attempted to flee in an automobile, the behavior indicated a clear intent to relinquish both control of the luggage as well as any expectation of maintaining the privacy of its contents); Commonwealth v. Byrd, 987 A.2d 786 (Pa.Super. 2009) (defendant who threw handgun under vehicle no longer retained expectation of privacy in abandoned property). Petitioner has therefore failed to demonstrate a cognizable expectation of privacy in the abandoned drugs. Trial counsel cannot be deemed ineffective for failing to file a motion to suppress where Petitioner has failed to meet his preliminary burden of establishing his right to challenge the seizure and use of the evidence by police.

Petitioner asserts that because he was stopped for a traffic violation, the "police should have issued a citation and then permitted [him] to leave the scene." Amended Petition, 12/17/19, at ¶ 11 b. He argues that since the police failed to do so, his detention was unlawful and should have resulted in the suppression of all the evidence seized as a result of the unlawful detention including the results of the K-9 search and the drugs found on the side of the roadway which he argues were abandoned as a result of police coercion.

It is well established that a legitimate stop for a traffic violation "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission" of issuing a ticket for the violation. Illinois v. Caballes, 543 U. S. 405, 407 (2005). It is also well established that "[a]lthough abandoned property may normally be obtained and used for evidentiary purposes by the police, such property may not be utilized where the abandonment is coerced by unlawful police action" since, under such circumstances it cannot be said that the evidence was "voluntarily" abandoned. Commonwealth v. Jeffries, 311 A.2d 914, 918 (Pa. 1973). However, the law, as

on top of the snow. N.T., Trial, 6/28/18, at 203-06. The black plastic bag was dry to the touch and had no snow on top of it. N.T., Trial, 6/28/18, at 206-07; Trial Exhibit C-5 at 25:30-33:10.

11

applied to the facts of this case, does not support Petitioner's assertion that the police were required to issue a citation and allow him to leave.

"The Fourth Amendment does not prevent police from stopping and questioning motorists when they witness or suspect a violation of traffic law, even if it is a minor offense." Commonwealth v. Chase, 960 A.2d 108, 113 (Pa. 2008). Typical inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Commonwealth v. Rodriguez, 575 U.S. 348, 355 (2015) (See Delaware v. Prouse, 440 U.S. 648, 658-659 (1979)). Moreover, "if there is a legitimate stop for a traffic violation. . .additional suspicion may arise before the initial stop's purpose has been fulfilled" and, if that occurs, "detention may be permissible to investigate the new suspicions." Commonwealth v. Harris, 176 A.3d 1009, 1020 (Pa.Super. 2017) (quoting Commonwealth v. Valdivia, 145 A.3d 1156, 1162 (Pa.Super. 2016)) (internal citation and quotation marks omitted).

To extend a traffic stop beyond the purposes of enforcing a traffic violation, "the seizure must be justified by an articulable, reasonable suspicion that [a defendant] may have been engaged in criminal activity independent of that supporting h[is] initial lawful detention." Commonwealth v. Freeman, 757 A.2d 903, 908 (Pa. 2000). If an officer develops reasonable suspicion of drug activity during the traffic stop to justify an investigative detention, the use of a dog sniff as part of the investigative detention is permissible. See also Commonwealth v. Green, 168 A.3d 180, 186 (Pa.Super. 2017) (officer who possessed reasonable suspicion that appellant was trafficking drugs, he had reasonable suspicion to deploy a K-9 unit to perform a canine sniff of the vehicle's exterior). The standard to be applied in determining whether reasonable suspicion exists is well established.

> [T]o establish grounds for reasonable suspicion, the officer must articulate specific observations which, in conjunction with

12

> reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity.

Commonwealth v. Basinger, 982 A.2d 121, 125 (Pa.Super. 2009) (alteration in original) (citations omitted) (quotation marks omitted). The issue of whether reasonable suspicion existed is to be decided based on the totality of the circumstances. Commonwealth v. Rogers, 849 A.2d 1185, 1189 (Pa. 2004). In making this determination, "due weight must be given. . .to the specific reasonable inferences [a police officer] is entitled to draw from the facts in light of his experience." Commonwealth v. Cook, 735 A.2d 673, 676 (Pa. 1999). "[E]ven a combination of innocent facts, when taken together, may warrant further investigation by the police officer." Id.

As a preliminary matter, it is important to note that Petitioner's testimony at the PCRA hearing regarding the length of his detention is belied by the record. Petitioner testified that he was detained for almost two hours before the K-9 search was conducted. N.T., PCRA Hearing, 8/18/20, at 14-15. He later testified that he was detained at the scene for "[a]n hour and a half, an hour and twenty or longer." N.T., PCRA Hearing, 8/18/20, at 16. Both estimations are inaccurate. The entire interaction between Petitioner, Saldana and police was recorded by the patrol car's mobile recording device. That recording and the accompanying timestamp establishes that the K-9 search occurred approximately thirty-six minutes after police directed Petitioner to pull the van onto the shoulder of the road. Petitioner's hands were cuffed and he was officially detained approximately thirty-seven minutes into the car stop.

Petitioner's contention that he was unlawfully detained during this period is also belied by the trial record. The officers who conducted the traffic stop had extensive education, training and experience in drug trafficking and in drug trafficking detection utilizing known drug trafficking

indicators.[5] N.T., Trial, 6/27/18, at 26-27; N.T., Trial, 6/28/18, at 223-224. At trial, they "articulated specific observations which, in conjunction with the reasonable inferences derived from those observations, led [them] to reasonably conclude, in light of [their training and] experience, that criminal activity was afoot and that the person [they stopped] was involved in that activity." Commonwealth v. Basinger, 982 A.2d at 125. Since the officers were presented with additional information to support their reasonable suspicion that the occupants were involved in drug trafficking "before the initial stop's purpose [was] fulfilled," the officers were entitled to detain Petitioner to investigate those suspicions. See Commonwealth v. Harris, 176 A.3d at 1020 (citations omitted).

At trial, the officers identified the following as known indicators of drug trafficking activity: operation of a third party vehicle not registered to any of the occupants; a single key in the ignition; the presence/use and quantity of masking agents such as air fresheners and laundry detergent; occupants of a vehicle who are unfamiliar with each other yet traveling together over long distances; occupants of a vehicle providing conflicting stories and failing to make eye contact when conversing with police; use of cash-only interchange lanes; traveling from source cities, i.e. locations from which narcotics are distributed; traveling in known drug trafficking corridors; possession/use of multiple cell phones; possession cheap/disposable flip style cell phones/possession of multiple cell phone SIM cards; making cell phone calls after being stopped; and the presence of large amounts of United States currency. N.T., Trial, 6/27/18, at 28, 30, 31, 33-35, 130-31, 135-36, 139-42; N.T., Trial, 6/28/18, at 249. All of these indicators were present in the instant case.

---

[5] As of the time of trial, Officer Bilecki had more than 100 hours of narcotics training and had participated in over 400 narcotics arrests. N.T., Trial, 6/27/18, at 24-25. Corporal Gansky testified had more than 500 hours of narcotics training and had participated in over 5,000 narcotics investigations. N.T., Trial, 6/28/18, at 222-23.

14

Prior to the traffic stop, the officers noted that the van travelled through a cash-only toll booth upon leaving the turnpike. Immediately following the traffic stop, reasonable suspicion that the occupants of the vehicle were engaged in drug trafficking rapidly developed. Upon approaching the van, the officers noted the presence of additional known drug trafficking indicators, specifically: (1) there was a single key in the ignition of the van, N.T., Trial, 6/27/18, at 53, 117; (2) there was an overwhelming odor of air fresheners, commonly used as masking agents, emanating from the van, N.T., Trial, 6/27/18, at 30, 53, 122; (3) laundry detergent, another commonly used masking agent was observed in the van, N.T., Trial, 6/27/18, at 54, 56; (4) Petitioner was unable to produce the registration for the van, N.T., Trial, 6/27/18, at 58, Trial Exhibit, C-5 at 6:17; (5) the van was owned by a third party who was not present, N.T., 6/27/18, at 60-61, Trial Exhibits C-1, C-4; (6) Petitioner was unable to identify the owner of the van, N.T., Trial, 6/27/18, at 113-14, 122, Trial Exhibit, C-5 at 2:12-2:30, 3:00-3:40, 6:17; (7) Petitioner claimed that a friend had given him permission to operate the van but could not provide the last name of the that friend, N.T., Trial, 6/27/18, at 114; (8) neither of the occupants of the van resided in the same geographical region as the registered owner, N.T., Trial, 6/27/18 at 47-48, 57, 59, 123, 126-127, Trial Exhibits C-1, C-4, Commonwealth Exhibit PCRA-1; (9) the occupants did not reside in the same geographic area as each other, N.T., Trial, 6/27/18 at 57-59, 126-27, Trial Exhibit C-6; (10) Petitioner resided in what has been identified as a source city, N.T., Trial, 6/27/18, at 122; (11) the address of the registered owner was identified as a high narcotics area, N.T., Trial, 6/27/18, at 122-23; (12) the passenger had a large amount of cash in his possession, N.T., Trial, 6/27/18, at 117; (13) that cash was secured with the same type of rubber band that is used in heroin packaging, N.T., Trial, 6/27/18, at 117-18, Trial Exhibit C-6; and (14) when asked where he was coming from, Petitioner stated that he had been at his mother's residence in Amboy,

15

New Jersey for the previous two or three days but was unable to provide her address, N.T., Trial, 6/27/18, at 61-62, Trial Exhibit C-5 at 3:44-4:38).

After the officers returned to their vehicle and ran the occupants' license/identification information through official databases (N.T., Trial, 6/28/18 at 243-46), the officers approached the vehicle a second time and immediately observed additional indicators of drug activity including: (1) Petitioner, who was still seated in the driver's seat, had two cell phones -- a smart phone and a flip phone, N.T., Trial, 6/27/18, at 130;[6] (2) Petitioner used the flip phone to make a telephone call during the traffic stop, N.T., Trial, 6/27/18, at 130, Trial Exhibits C-5 at 19:38-19:55C-8, C-9; (3) Petitioner made inconsistent statements regarding where he was coming from at the time he was stopped, first stating that he was coming from his mother's residence in Amboy, New Jersey, then stating that he had gone to the King of Prussia Mall to pick up his passenger after returning from Harrisburg where he had been looking at a motorcycle he was considering buying from a friend and finally stating that, prior to going to King of Prussia, he had been in Norristown, N.T. , Trial, 6/27/18, at 61-63, 155, Trial Exhibit C-5 at 3:44-4:38, 14:12-15:25, 27:30-28:18; (4) Petitioner barely knew his passenger and referred to him by first name only, N.T., Trial, 6/27/18, at 158-59, Trial Exhibit C-5 at 31:00-32:00; (5) Petitioner and Saldana gave inconsistent information regarding Saldana's address; Petitioner told police that Saldana lived near Roosevelt Boulevard in Philadelphia although Saldana's license indicated that he resided in Englewood, New Jersey, Trial Exhibit C-5 at 25:30-26:30, N.T., Trial, 6/27/18, at 126-27, 153; (6) Petitioner was unable to provide the address in Philadelphia where he first met Saldana just days before, N.T., Trial, 6/27/18, at 62-63, 158-59, Trial Exhibit C-5 at 31:28-32:00; and (7) when he was asked how her

---

[6] Officer Bilecki testified that two telephones are commonly used by those engaged in drug trafficking, an inexpensive, disposable phone to be used to facilitate drug transactions and a more expensive smart phone for personal use. N.T., Trial, 6/27/18, at 130-31.

16

knew any of these people, Petitioner responded: "I don't know." Trial Exhibit C-5 at 32:00-32:43.

In reviewing the officers' actions, a court "must give weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience and acknowledge that innocent facts, when considered collectively, may permit the investigative detention" Commonwealth v. Newsome, 170 A.3d 1151, 1154 (Pa.Super. 2017) (citation and quotation marks omitted). The facts and circumstances involved here and the reasonable inferences drawn from them considered collectively and in light of the officers' experience establish that the officers had reasonable and articulable grounds to suspect that Petitioner was engaged in drug trafficking and therefore could lawfully prolong the traffic stop to confirm or dispel their suspicion. See Commonwealth v. Caban, 60 A.3d 120, 129 (Pa.Super. 2012) (following valid traffic stop for speeding, officer had reasonable suspicion of criminal activity to justify continued detention of driver and passenger based on evidence that the driver acted nervously, car was owned by third party not present in vehicle, answers provided by driver and passenger to basic questions regarding their destination were inconsistent, and various masking agents, including air fresheners, canisters of perfume, and bottle of odor eliminator, were present in vehicle).

Petitioner argues that the facially inconsistent and evasive statements he made during the car stop were the result of a language barrier and therefore cannot be considered in assessing whether reasonable grounds existed for the officers to detain him following the initial traffic stop for driving an unregistered vehicle. This argument is not persuasive. At the PCRA hearing, trial counsel testified that Petitioner was able to carry on simple conversations in English. N.T., PCRA Hearing, 8/18/20, at 35. Trial counsel's testimony is borne out by Petitioner's interaction with police during the car stop. The questions being posed were basic questions posed in clear, concise and simple language. Petitioner responded with appropriate and responsive answers. Based on

17

his interaction with Petitioner, Officer Bilecki concluded that Petitioner's claim that he could not understand him was disingenuous. At trial, Officer Bilecki testified that, after the van was stopped, he had several discreet interactions with Petitioner during which he questioned Petitioner. He testified that during his first and second interactions, [Petitioner] had no difficulty responding to his questions and answering in English. When he questioned him a third time, [Petitioner] began to indicate for the first time that he did not fully understand what he was being asked. N.T., Trial, 6/27/18, at 137-38. Given these circumstances and all the other surrounding circumstances, it was reasonable for Officer Bilecki to infer that Petitioner's statements were not the result of a language barrier and therefore Officer Bilecki properly considered those statements in evaluating whether "criminal activity was afoot." In any case, even if Petitioner's statements were not considered, the record supports a finding that the officers still had reasonable suspicion to detain Petitioner given the presence of numerous other drug trafficking indicators.

Since the officers had reasonable and articulable grounds to suspect that Petitioner was engaged in drug trafficking, Petitioner 's argument that the K-9 search was unlawful lacks merit. In the Interest of A.A., 195 A.3d 896, 905 (Pa. 2018); Commonwealth v. Green, 168 A.3d 180, 186 (Pa.Super. 2017) (where officer possessed reasonable suspicion that appellant was trafficking drugs, he had reasonable suspicion to deploy a K-9 unit to perform a dog sniff of the vehicle's exterior). Since there was no illegal detention, Petitioner's claim that the drugs were abandoned as a result of coercive police conduct also lacks merit. Having relinquished his privacy interest by voluntarily abandoning the drugs, Petitioner cannot challenge their seizure and admission into evidence. Commonwealth v. Shoatz, 366 A.2d at 1220. Finally, since the officers had reasonable and articulable grounds to suspect that Petitioner was engaged in drug trafficking, the officers' observations and all other evidence obtained during the car stop was constitutionally obtained and

18

therefore properly admitted at trial. Having failed to establish that any of his suppression claims have merit, Petitioner's claim of ineffective assistance of counsel for failing to file a motion to suppress the evidence cannot support a claim for PCRA relief. Commonwealth v. Johnson, 179 A.3d at 1160.

## Conclusion

For the reasons set forth above, this Court denied Petitioner's request for PCRA relief.

BY THE COURT:

5-4-21

**Date**

**DIANE E. GIBBONS, J.**