**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Micah DALES, Appellee.**

Superior Court of Pennsylvania.

Argued Jan. 8, 2003.

Filed March 25, 2003.

Stephen B. Harris, Asst. Dist. Atty., Doylestown, for Com., appellant.

Kevin M. Leckerman, Doylestown, for appellee.

BEFORE: KLEIN, BENDER, and CAVANAUGH, JJ.

OPINION BY BENDER, J.:

¶ 1 The Commonwealth appeals from the trial court's order granting Micah Dales' (Defendant) motion to suppress illegal drugs found in his car. The Commonwealth claims that the trial court erred in determining that the search of Defendant's vehicle was illegal. For the following reasons, we affirm.

¶ 2 The trial court made the following findings of fact from the bench at the conclusion of the suppression hearing.

Officer David Clee, Jr., is an eight year veteran of the Bensalem Township Police Department and on February 7, of this year was duly employed as a police officer. At roughly 9:30 p.m. on that date, that is February 7, 2002, Officer Clee was in full uniform and was operating a marked patrol automobile. He was accompanied on that evening by Detective Gross of his department who was riding as a passenger and back-up.

And in the rear of his patrol vehicle was a K–9 dog trained, among other things, for drug sniffing or detection.

At roughly 9:30 p.m., Officer Clee had parked his unit in a position which he could observe traffic leaving Pennsylvania Turnpike, Exit 28, at which ... U.S. Route 1 and the Pennsylvania Turnpike intersects, thus the traffic he was observing was leaving the Turnpike after going through the toll booths and approaching a set of ramps which would allow the traffic to—either to go north or south on Route 1.

Among the violations which Officer Clee was looking for that evening was excessive tinting of windows. At about 9:30 p.m., Officer Clee observed a Buick automobile with a Pennsylvania registration plate which had heavily tinted side and rear windows. The car was a four-door automobile and the windows in all four doors and the rear window were heavily tinted. This he observed as the car passed his unit from about 25 yards away when his attention was first drawn to the vehicle. He could not see inside it to determine how many people occupied it or who might be operating it.

The area around the Turnpike interchange is very brightly lighted and has substantial amounts of elevated artificial light. So although it was dark out, the officer had ample opportunity to view the vehicle and to make a reasonably accurate determination about the excessive degree of the window tinting.

Upon observing the vehicle pass his in the southbound ramp, Officer Clee pulled out and followed the vehicle for something less than a mile until that point at which Route 1 widened out so that there is both light from the nearby service stations and businesses, and an ample shoulder so that a carstop may be

made safely. When that point was reached, Officer Clee activated his overhead lights and the Buick automobile pulled to the shoulder of the road. And Mr.—or rather Officer Clee followed and stopped behind it. Officer Clee alighted from his vehicle and walked to the driver's side of the Buick. By this time, the driver's door window had been lowered, and Officer Clee observed the defendant in this matter. Micah Dales, seated behind the steering wheel. As he reached the open window, Officer Clee observed a bunch of, which I assume means several, three or more, air freshener devices designed to be hung from the rearview mirror or elsewhere in the interior of the vehicle. These fresheners appeared to be new, still partially wrapped in plastic. The officer, in addition to smelling the particular aroma coming from the air fresheners, also detected a smell which he described as mediciney, something like Bactine. While the officer found this smell to be out of the ordinary and felt that it suggested the presence of some kind of—either some kind of chemical or, conceivably, some kind of masking scent, he was not able to definitively relate it to any particular controlled substance. The defendant appeared to be nervous in responding to the officer's questions. The officer directed the defendant to produce, and he did produce, a driver's license, ownership documentation for the Buick, and a proof of insurance for the vehicle.

While they were interacting with the defendant seated behind the wheel of his vehicle and Officer Clee standing outside of the car, Officer Clee asked the defendant a few—well, at least simple questions, where was the defendant coming from, and where, to which the defendant responded that he had gone to New York and was now headed home. . . . But at any rate, after that questioning,

the officer returned to his vehicle with the cards and proceeded to communicate with Bucks County police radio, ultimately determining that everything was in order, in the sense that the driver's license proffered by the defendant was legitimate and the driver, according to the information received by Officer Clee, was duly licensed to operate the automobile, the automobile was duly registered, and the insurance card proffered appeared to correspond to Department of Motor Vehicle records concerning financial security as proffered by the person registering the vehicle. The officer was quite certain, from his observation of the vehicle windows, that their degree of tint was substantially in excess of that permitted by the Pennsylvania Department of Motor Vehicle regulations and, accordingly, wrote up a warning slip advising the defendant of this fact.

Officer Clee then returned to the vehicle, requested that the defendant come with him to the police vehicle. And when the defendant, who continued to appear nervous, complied with his request, the two stood outside of the vehicle and Officer Clee pointed out that his vehicle, the police vehicle, was permissibly tinted, specifically the windshield and front door windows were essentially a factory tint, a relatively unnoticeable tint, and the rear door windows and rear window were tinted to a substantially greater degree to help provide a comfortable environment for the dog who would regularly be in that rear compartment of the vehicle. This was exhibited to the defendant, and the defendant was instructed that this was a permissible tinting arrangement and what he needed to do was either to remove or substantially reduce the level of tint of his windshield and front door windows.

In the sequence of events, it would appear that at or about this time in the events, Officer Clee returned the various cards, vehicle documents, to the defendant. Some time during this series of events, Detective Gross had also alighted from the police vehicle. And the three, Detective Gross who was not in uniform, Officer Clee, and the defendant, stood in front of the police vehicle and behind the Buick automobile and conversed. Officer Clee began to ask additional questions of the defendant reviewing some of the questions he had asked while they—while he was standing beside the car; where the defendant had gone, and—where he was coming from, rather, which he replied New York. And in response to questions, explained that he had visited a cousin. And I am remembering the first time during the initial encounter Officer Clee had inquired who had been visited and the explanation of visiting a cousin had been given, however, the manner in which the answer was given indicated that the—indicated the sex of the cousin. When the question was asked again as these three individuals were standing between the vehicles, the defendant responded indicating an—the opposite sex from that which he had previously stated. And when this inconsistency was called to his attention, he explained that his cousin was actually a transsexual who, I believe, was a male who dressed as a female.

The defendant also volunteered that the defendant's brother was a highway cop in the City of Philadelphia.

The officer then proceeded to inquire of the defendant whether he had anything in his vehicle of an illegal nature. Also, in the course of this questioning he inquired whether the passenger in the vehicle had visited with the cousin and was told that he had remained in the vehicle, had not met the cousin.

The defendant responded that there was nothing of an illegal nature in the car. Officer Clee inquired whether the passenger may have either acquired or had on his person anything illegal because he had been left unsupervised in the car in New York for apparently some period of time.

In the context of these repeated questions concerning whether anything illegal was present in the vehicle to which the defendant responded in the negative, the officer inquired whether the defendant would give permission to search the vehicle so the officers could satisfy themselves. And the defendant responded yes. . . .

The officer then took the ignition keys, or ring of keys which included the ignition key which was still in the ignition of the vehicle, removed it, and using the trunk key from that ring, opened the trunk in the presence of both the defendant and his passenger.

The officer observed, in the trunk, two backpacks of the sort now used by children to carry books and other things in for school ... Officer Clee proceeded to open one of the duffel bags and observed a package which he explored and determined to contain a material which he suspected, based on its appearance, to be crack cocaine in approximately the quantity of one pound.

Upon observing this substance, the officer seized it and placed both the defendant and his passenger under arrest.

Trial Court Opinion (T.C.O.), 8/29/02, at 1–4; N.T., 5/23/02, at 67–77. Prior to trial, Defendant filed a motion to suppress, which the court granted. The Commonwealth then filed this appeal raising one question for our review.

A. Whether the lower court erred in determining that the request for consent to search appellee's vehicle constituted a second encounter necessitating independent factors justifying probable cause to request a search of appellee's vehicle.

Brief for Appellant at 1.

¶ 3 "When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted." *Commonwealth v. Nester*, 551 Pa. 157, 709 A.2d 879, 880–81 (1998). "We are bound by the lower court's findings of fact if they are supported in the record, but we must examine any legal conclusions drawn from those facts." *Commonwealth v. Pickron*, 535 Pa. 241, 634 A.2d 1093, 1096 (1993).

¶ 4 We begin our analysis by noting that neither party disputes the legality of the initial traffic stop. Furthermore, during a traffic stop, an officer may order the driver out of the vehicle in the course of conducting the stop and issuing a citation. *See Commonwealth v. Freeman*, 563 Pa. 82, 757 A.2d 903, 907 n. 4 (2000). During traffic stops, officers often observe facts that lead them to a reasonable suspicion that some alternate criminal activity is afoot, and therefore, the officers prolong their encounter with the driver although the purpose of the initial traffic stop has been achieved. Recently, courts have been asked to examine these subsequent interactions to determine their legality.

¶ 5 In the instant case, the Commonwealth concedes that Defendant was seized at the time that he gave Officer Clee consent to search the vehicle.[1] Brief for Appellant at 10 (stating that "the subsequent interaction between police and [Defendant] was merely a continuation of the initial lawful detention"). Thus, the Commonwealth argues that the seizure was valid, as it was simply a continuation of the initial traffic stop. Defendant argues as well that he was seized during a continuing investigation that began with the traffic stop. But Defendant claims that because the seizure continued after the police had achieved the purpose of the initial traffic

---

1. However, in analyzing the issue before us, we do not rely entirely upon the Commonwealth's concession that Defendant was seized throughout the course of the traffic stop, as the facts plainly illustrate that this was in fact the case. As we stated in *Commonwealth v. Zogby*, 455 Pa.Super. 621, 689 A.2d 280 (1997), "[m]ost people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him." 689 A.2d at 282 (alteration in original) (quotation marks omitted). In this case, although Officer Clee handed Defendant his documents and the warning, he continued to ask Defendant questions while they were standing on the side of the road and in the presence of another officer, Detective Gross, and never informed Defendant that he was free to leave. We conclude that a reasonable person in Defendant's situation would not have felt free to simply decline to answer Officer Clee's further inquiries, bid him farewell, and return to his vehicle and drive away. Rather, any reasonable person in Defendant's situation would have felt compelled to respond to Officer Clee's inquiries or else risk him becoming ireful. *See id.* (stating that, "[T]he reality of the matter is that when a police officer requests a civilian to do something, even something as simple as 'move along,' it is most often perceived as a command that will be met with an unpleasant response if disobeyed. Thus, unless told that they have a right to decline, most individuals are not likely to perceive a request from a police officer as allowing for a choice."). Accordingly, we conclude that Defendant was seized throughout the stop.

stop, they needed reasonable suspicion to support their continued investigation.[2] We agree.

¶ 6 In *Commonwealth v. By,* 812 A.2d 1250 (Pa.Super.2002), this Court addressed a scenario similar to the one presented in the instant case:

In *Strickler* [, 563 Pa. 47, 757 A.2d 884 (2000) ] and its companion case, *Commonwealth v. Freeman,* 563 Pa. 82, 757 A.2d 903 (2000), our Supreme Court has used these principles regarding seizure to examine a subsequent citizen/police interaction following a valid traffic stop. In these cases, the Court recognized that the transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. Although there may be no question regarding the validity of the initial traffic stop, **the crucial question is when the validity of that stop ceased.**

**Where the purpose of an initial, valid traffic stop has ended and a reasonable person would have believed that he was free to leave, the law characterizes a subsequent round of questioning by the officer as a mere encounter.** Since the citizen is free to leave, he is not detained, and the police are free to ask questions appropriate to a mere encounter, including a request for permission to search the vehicle. **However, where the purpose of an initial traffic stop has ended and a reasonable person would not have believed that he was free to leave, the law characterizes a subsequent round of questioning by the police as an investigative detention or arrest.** In the absence of either reasonable suspi-

cion to support the investigative detention or probable cause to support the arrest, the citizen is considered unlawfully detained. **Where a consensual search has been preceded by an unlawful detention, the exclusionary rule requires suppression of the evidence obtained** absent a demonstration by the commonwealth both of a sufficient break in the causal chain between the illegality and the seizure of evidence. This assures of the search's voluntariness and that the search is not an exploitation of the prior unlawful detention.

*Id.* at 1255–56 (quotation marks and citations omitted) (emphasis added). *See also Commonwealth v. Strickler,* 563 Pa. 47, 757 A.2d 884, 896 (2000) (stating that, "Our jurisprudence under Article I, Section 8 of the Pennsylvania Constitution, however, would not sustain a consent search conducted in the context of, but which is wholly unrelated in its scope to, an ongoing detention, since there can be no constitutionally-valid detention independently or following a traffic or similar stop absent reasonable suspicion, *see, e.g., Commonwealth v. Melendez,* 544 Pa. 323, 676 A.2d 226, 229 (1996), and the scope of a detention is circumscribed by the reasons that justify it.").

¶ 7 Thus, we must determine whether the police had reasonable suspicion to detain Defendant after the purpose of the initial traffic stop had been achieved. If they did not, the unlawful detention invalidates the subsequent consent and we shall affirm the trial court's decision to suppress the evidence. In this regard, the Commonwealth argues that Officer Clee continued the investigation based on his "suspicions which arose from the intense smell of

---

**2.** We note that the trial court decided this case on a different basis, but as Defendant claims, we can nonetheless affirm the trial court's decision for reasons other than those

relied upon by the trial court. *See Commonwealth v. Harper,* 416 Pa.Super. 608, 611 A.2d 1211, 1213 n. 1 (1992).

bactine, the clear use of air fresheners to mask the smell, and Appellee's inconsistent statements regarding his activities in New York." Brief for Appellant at 10. However, after reviewing the facts of this case we conclude that Officer Clee did not possess a reasonable suspicion to support the continued detention of Defendant once the purpose of the initial traffic stop had ended.

¶ 8 Initially, we note that the reason for the initial traffic stop was the excessive tinting on Defendant's vehicle's windows. When Officer Clee approached Defendant and requested his license, registration, and proof of insurance, Defendant complied and gave Officer Clee the requested documents. Officer Clee then returned to his police car, radioed the information in, and established that everything was in order. He then wrote up a warning slip advising Defendant of the excessive tinting and returned to Defendant's vehicle. Officer Clee then instructed Defendant to accompany him back to the police vehicle so that he could instruct Defendant on the proper amount of tinting, as demonstrated by the tinting of the police vehicle's windows. Defendant complied and followed Officer Clee to the police vehicle, where Officer Clee took approximately 20–30 seconds to point out the permissible amount of tinting. N.T., 5/23/02, at 40. Following this exchange, Officer Clee returned Defendant's various documents to him along with the warning regarding the excessive tint.[3] We conclude that the purpose of the initial traffic stop ended at this point.

▮▮▮ ¶ 9 Nonetheless, Officer Clee continued with a "second . . . round of

questioning." N.T., 5/23/02, at 52. In accordance with our statement in *By*, 812 A.2d at 1255–56, we conclude that this second round of questioning constituted an investigative detention, and that Officer Clee lacked the reasonable suspicion necessary to support it. This Court recently reiterated our standard for determining whether reasonable suspicion exists:

> Although a police officer's knowledge and length of experience weigh heavily in determining whether reasonable suspicion existed, our Courts remain mindful that the officer's judgment is necessarily colored by his or her primary involvement in "the often competitive enterprise of ferreting out crime." *In re D.E.M.*, 727 A.2d 570, 578 n. 19 (Pa.Super.1999) (quoting *Terry[ v. State]*, 392 U.S. [1] at 11–12, 88 S.Ct. 1868[, 20 L.Ed.2d 889 (1968)]). Therefore, the fundamental inquiry of a reviewing court must be an objective one, "namely, whether 'the facts available to the officer at the moment of the [intrusion] warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *Commonwealth v. Zhahir*, 561 Pa. 545, 751 A.2d 1153, 1156 (2000) (insertion in *Zhahir*). *This inquiry will not be satisfied by an officer's hunch or unparticularized suspicion.*

*Commonwealth v. Reppert*, 814 A.2d 1196, 1204 (Pa.Super.2002) (en banc) (citations omitted).

¶ 10 In attempting to bolster Officer Clee's suspicions, the Commonwealth relies on inconsistencies in Defendant's rendition of what occurred on his trip to New York. However, these inconsistencies

---

**3.** Officer Clee gave extensive testimony at the suppression hearing. During his testimony, the Commonwealth, the defense attorney, and the court thoroughly questioned him on the chronology of the events, which at some times was confusing. However, as the trial court found in its findings of fact, Officer Clee returned Defendant's documents along with the warning, and thereafter continued questioning Defendant, ultimately obtaining his consent to search the vehicle. N.T., 5/23/02, at 51 (where Officer Clee stated that he handed Defendant the "written warning statement" and his documents "right after [Officer Clee] explained the window tint to [Defendant]").

were revealed in the course of the second round of questioning and were not known to Officer Clee at the time that the purpose of the initial traffic stop ended. Furthermore, while the Commonwealth claims that Officer Clee "recognized the smell of bactine as being produced from cocaine," the trial court found that although Officer Clee thought the bactine smell came from "either some kind of chemical or, conceivably, some kind of masking scent, he was not able to definitively relate it to any particular controlled substance." T.C.O. at 2. And as Defendant argues, the record supports this finding because Officer Clee admitted that "it wasn't until after [he] actually discovered this alleged crack cocaine that [he] realized that what [he] was smelling was not, in fact, Bactine, but something else[.]" N.T., 5/23/02, at 46. Therefore, at the point in time that the second round of questioning began, Officer Clee had only observed the following facts: (1) there was a smell of bactine emanating from Defendant's vehicle; (2) there were several air fresheners in the vehicle; and (3) Defendant appeared nervous.

¶ 11 We conclude that these facts were insufficient to establish anything more than a hunch of possible criminal activity being afoot. Thus, we find that Officer Clee lacked the reasonable suspicion necessary to conduct the second round of questioning, and consequently, the continued investigative detention was illegal. Accordingly, the consent obtained during this illegal detention was invalid and the drugs seized during the following search were properly suppressed.

¶ 12 Order **AFFIRMED**.

¶ 13 Judge CAVANAUGH concurs in the result.