J-A14032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ARGENTIS JAQUEZ-JAQUEZ | : | No. 2048 EDA 2022 |

Appeal from the Order Entered August 3, 2022
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0002894-2021

BEFORE: PANELLA, P.J., DUBOW, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED OCTOBER 19, 2023**

The Commonwealth appeals the order granting Argentis Jaquez-Jaquez's ("Jaquez")[1] motion to suppress evidence.[2] We affirm.

The evidence presented at the suppression hearing was as follows. On April 12, 2021, between 3:00 and 3:30 p.m., Pennsylvania State Police Trooper Brian Konopka ("Trooper Konopka") was parked on the median of I-78 in Allentown in an unmarked SUV equipped with lights and sirens. Trooper Konopka was working as part of the Safe Highways Initiative thru Effective Law Enforcement and Detection ("SHIELD") drug interdiction unit. *See* N.T., 4/20/22, at 6-10, 20.

---

[1] Appellee identifies himself as "Jacquez" in his appellate brief.

[2] The Commonwealth is permitted to take an appeal as of right from an order that does not end the entire case where, as here, it certifies that the order "will terminate or substantially handicap the prosecution." Pa.R.A.P. 311(d).

Jaquez, who was driving a Honda Accord with heavily tinted windows and a New Jersey license plate, passed Trooper Konopka while driving above the speed limit. *See id*. at 10-12, 49-50. Despite the fact that he was not significantly exceeding the speed limit, Jaquez applied his brakes several times as he passed Trooper Konopka's unmarked SUV, unlike the other cars driving in the same direction. *See id*. at 10-12, 42-43. Jaquez's car had been newly registered. Trooper Konopka testified that in his experience drug trafficking organizations often re-register cars in other people's names. *See id*. at 12, 49-50. The car's heavy window tint also indicated to the trooper a design to prevent the observation of the type of day-time drug transactions he frequently investigated. *See id*. at 13.

Trooper Konopka followed Jaquez's car, which was still exceeding the speed limit, to the point where Route 145 merges with South Fourth Street in Allentown. *See id*. at 13-14. The trooper pulled beside the car but could not see into it. He conducted a traffic stop of Jaquez, who had a female passenger later identified as Yaritza Jaquez ("Yaritza"). The trooper's vehicle had a Motor Vehicle Recorder ("MVR") which began recording when the trooper began following Jaquez's car.[3] Jaquez pulled his car over to the side of the road when directed to do so. *See id*. at 14-20; Exhibit C-1 at 00:48.

_____

[3] The MVR recording was introduced as Commonwealth Exhibit C-1 ("Exhibit C-1"). *See* N.T. 4/20/22, at 17.

Trooper Konopka approached Jaquez's car and told him and Yaritza he stopped the car because of Jaquez's speed and the car windows' excessive tinting. Trooper Konopka asked Jaquez for his driver's license and told him that "as long as everything's good, I'll give you a warning, okay?" **See** N.T., 4/20/22, at 22, Exhibit C-1 at 1:02-1:45. Jaquez gave the trooper his driver's license. The trooper asked Jaquez for his registration and proof of insurance. When Jaquez paused, the trooper told him to bring those materials to his SUV's passenger side and walked back to the SUV. **See** Exhibit C-1 at 1:45-2:00.

Jaquez joined Trooper Konopka moments later and leaned into the open passenger-side window. The trooper asked Jaquez whether he spoke English, and Jaquez answered in English, "a little." **See** Exhibit C-1 at 2:17. The trooper asked, in Spanish, where Jaquez was going. Jaquez said, in English, that he was visiting his cousin "right here." **See** Exhibit C-1 at 2:23-24. The trooper asked Jaquez whether he lived in Jersey City, as his license stated, or Trenton, as his registration stated. Jaquez answered Jersey City. Jaquez handed the trooper his cell phone with his insurance information. The trooper returned it twenty seconds later. **See** N.T., 4/20/22, at 23-24; Exhibit C-1 at 3:15. The trooper asked Jaquez if Yaritza was his girlfriend. Jaquez said, "Yes." **See** Exhibit C-1 at 3:21-22. The trooper asked how long Jaquez would be in Allentown, and Jaquez answered that he was going back to New Jersey that night. After the trooper ran a computer check and worked on a "contact

data" report, he started typing a warning on TraCS.[4] He asked Jaquez what he did for work and Jaquez answered that he worked for Uber and had also worked in construction for four or five years. *See* N.T., 4/20/22, at 23, 55, 57; Exhibit C-1 at 3:25-4:10.

Trooper Konopka told Jaquez he was going to give him a warning with "no points, no fine, nothing goes on your license, okay? *See* Exhibit C-1 at 4:12-4:20. He started to warn Jaquez to be "cognizant,"[5] then asked if Jaquez came to Pennsylvania a lot. Jaquez said he had been in Allentown two weeks before and had family there. When the officer asked where the family lived, Jaquez paused before saying that they were on Fourth Street. Having noticed a car seat, Trooper Konopka asked if Jaquez had children and Jaquez said that he had a two-year-old child and his wife had a child at home. In response to a series of questions, Jaquez said he would only be in Allentown for two or three hours and had a cousin who lived there. When asked for the cousin's name, Jaquez paused before saying, "Eric Espino." *See* Exhibit C-1 at 5:27-28. As the trooper typed into his computer, Jaquez volunteered that it was cold in Allentown compared to New Jersey. After a pause during which he typed into his computer, the trooper responded conversationally. The trooper

---

[4] The Commonwealth did not present testimony about what TraCS is.

[5] The trooper appeared to be ready to warn Jaquez about returning to Pennsylvania with heavily tinted windows but found himself using a word, "cognizant," Jaquez might not understand.

said he (the trooper) needed to get out of the car, rolled up the passenger side window, and went to speak to Jaquez's passenger. *See* Exhibit C-1 at 6:38-54. The trooper testified Jaquez's conduct of repeatedly tapping his brakes, as well as the window tinting, the new registration of his car, and what the trooper testified was Jacquez's hesitation and lack of specificity when asked about the name of his cousin and his reason for being in Allentown, raised his suspicions and caused him to conduct a further investigation. *See* N.T. 4/20/22, at 23-25.

Trooper Konopka went to speak to Yaritza, a New Jersey resident, and asked for her identification. The trooper did not recognize the form of identification Yaritza provided. In answer to the trooper's questions, Yaritza said she did not know where she was going, had slept on the drive, and would be going home the same day. *See id*. at 26-28; Exhibit C-1 at 6:55 to 7:25. When asked, Yaritza said she had met Jaquez about one month before, and he did some type of construction work. She stated they were in Allentown to visit his friend, whose name she did not know, which was inconsistent with Jaquez's statement they were going to see his cousin. Yaritza said Jaquez would drive her home. The trooper returned to his vehicle. *See* N.T., 5/20/22, at 26-28, Exhibit C-1 at 7:53 to 9:15.

Jaquez joined the trooper almost immediately. The trooper asked if Yaritza's form of identification was new. Jaquez responded that "his wife," which he corrected to "his girlfriend" (meaning Yaritza), had the same last

name as he did, and they had been dating for about six months. *See* Exhibit C-1 at 9:15-9:45. Trooper Konopka asked Jaquez if he had anything illegal in the car like drugs; Jaquez answered no. Jaquez said he had his car five or six months. The trooper asked if he could search the car. After initially misunderstanding the trooper as seeking the car's VIN number, Jaquez said concerning the search, "Yeah, if you want." *See* Exhibit C-1 at 10:36-11:45. The trooper ascertained Jaquez could read Spanish, then called for backup and filled out a Spanish consent form which he gave to Jaquez, who took several minutes to read and sign the form. *See* N.T., 4/29/22, at 29-32; Exhibit C-1 at 11:45-17:47. Another trooper arrived, and Trooper Konopka began to conduct the vehicle search, while the other trooper stood with Jaquez and Yaritza. *See id*. at 33; Exhibit C-1 at 17:47-18:25. During the search, Trooper Konopka discovered 500 grams of fentanyl wrapped in a large ball of black electrical tape in Jaquez's car. *See* N.T., 4/20/22, at 35-36.

At the conclusion of the hearing, the suppression court invited briefing. After briefing, the trial court granted Jaquez's motion to suppress. The Commonwealth timely appealed the suppression ruling. Both the Commonwealth and the trial court complied with Pa.R.A.P. 1925.

The Commonwealth presents two issues for review:

1.  Did the trial court err in granting [Jaquez's] motion to suppress evidence seized from [Jaquez's] [car] where the traffic stop was not unlawfully prolonged?

2.  Was [Jaquez's] consent to search the [car] valid where it was given during a lawful traffic stop and it was knowing, intelligent, and voluntary?

Commonwealth's Brief at 4.

When the Commonwealth appeals an order granting a defendant's motion to suppress, this Court considers only the evidence from the defense witnesses[6] together with the evidence of the prosecution that when read in the context of the entire record remains uncontradicted. *Commonwealth v. Dales*, 820 A.2d 807, 812 (Pa. Super. 2003) (citation omitted). A reviewing court is bound by the lower court's findings of fact if they are supported in the record but conducts plenary review to determine if the court properly applied the law to the facts. *See Commonwealth v. Dunkins*, 263 A.3d 247, 252 (Pa. 2021); *Dales*, 820 A.2d at 812.

A seizure for a traffic violation justifies a police investigation of that violation. A traffic stop is "[a] relatively brief encounter . . . more analogous to a . . . *Terry* stop . . . than to a formal arrest." *See Rodriguez v. U.S.*, 575 U.S. 348, 354 (2015) (internal citations and quotation marks omitted). This Court recently emphasized that *Rodriguez* limits the length of police

---

[6] Jaquez presented no evidence in this case.

inquiries during a traffic stop to the seizure's "mission," *i.e.*, the time necessary to address the violation and attendant safety concerns:

> In the context of a traffic stop, the United States Supreme Court held that the duration of police inquiries "is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (citations omitted).[7]  A stop becomes unlawful when it "last[s] . . . longer than is necessary" to complete its mission, the rationale being that the "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."  The Supreme Court elaborated that "[t]he critical question . . . is not whether the [inquiry] occurs before or after the officer issues a ticket . . . but whether [it] prolongs—, *i.e.*, adds time to—the stop. . ..  An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

*Commonwealth v. Ross*, 297 A.3d 787, 792 (Pa. Super. 2023) (citations omitted).  *Accord Commonwealth v. Sloan*, --- A.3d ---, ---, No. 1483 WDA 2022 (Pa. Super., filed 9/21/23, at 13).

During a traffic stop, an officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *Ross*, 297 A.3d at 793.  The officer may also check the driver's license, determine whether the driver has outstanding warrants, and inspect the car's registration and proof of insurance.  *See Commonwealth*

---

[7] Vehicle stops that are constitutional under *Terry* satisfy the Pennsylvania constitution.  *See Commonwealth v. Chase*, 960 A.2d 108, 117 (Pa. 2008).

***v. Malloy***, 257 A.3d 142, 150 (Pa. Super. 2021). Any violation of the motor vehicle code legitimizes a traffic stop, even if the stop is merely a pretext for the investigation of some other crime and even if the violation is a minor offense. ***See Commonwealth v. Harris***, 176 A.3d 1009, 1020 (Pa. Super. 2017), citing, *inter alia*, ***Whren v. United States***, 517 U.S. 806, 812-13 (1996). If police develop additional suspicions before the mission of the traffic stop is complete, they may continue the stop to investigate the new suspicions. ***See Commonwealth v. Chase***, 960 A.2d 108, 115, n.5 (Pa. 2008).

"To establish reasonable suspicion, an officer must articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity." ***Commonwealth v. Basinger***, 982 A.2d at 121, 125 (Pa. Super. 2009) (citation omitted). In assessing reasonable suspicion, this Court considers the totality of the circumstances giving due weight to the officer's experience and the inferences he may draw in light of that experience. Even a combination of innocent facts when taken together may warrant the officer's further investigation. ***See Commonwealth v. Rogers***, 741 A.2d 813, 817 (Pa. Super. 1999). A police officer has reasonable suspicion when he is "able to articulate something more than an 'inchoate and unparticularized suspicion or hunch'" that criminal activity is afoot. ***Alabama v. White***, 496 U.S. 325,

329 (1990), quoting **Terry v. Ohio**, 392 U.S. 1, 22 (1968); *accord* **Commonwealth v. Hughes**, 908 A.2d 924, 927 (Pa. Super. 2006) (stating that the reasonable suspicion standard is less stringent than probable cause). The likelihood of criminal activity sufficient to establish reasonable suspicion "falls considerably short of satisfying a preponderance of the evidence standard." **United States v. Arvizu**, 534 U.S. 266, 274 (2002). Reasonable suspicion is measured in light of the totality of the circumstances, **see** **Rogers**, 741 A.2d 817, and is assessed using an objective standard, without regard to the officer's subjective motivation. **See Commonwealth v. Foglia** 979 A.2d 357, 361 (Pa. Super. 2009).

The Commonwealth argues the traffic stop was undisputedly legal and the observations the trooper made during the mission of the traffic stop provided reasonable suspicion of drug activity. It cites twelve factors it claims created reasonable suspicion:

1. Jaquez's reaction to the trooper's presence parked on the median;

2. Jaquez's use of a newly registered vehicle and the trooper's experience with drug traffickers' use of such vehicles;

3. the window tinting and drug traffickers' use of such tinting;

4. Jaquez's vague responses to questions about his travel arrangements;

5. the short nature of Jaquez's trip, consistent with drug delivery;

6. Jaquez's delayed response to the name of his cousin;

- 10 -

7.      Yaritza's statement that they were visiting a friend, not a cousin;

8.      Yaritza's unawareness of how long they had been traveling;

9.      Yaritza's lack of knowledge about their destination;

10.     The different versions Jaquez and Yaritza gave about how long they had been dating;

11.     Yaritza's saying they would go home once they were done and Jaquez's statement that they were hanging out; and

12.     Jaquez's apparent nervousness about where they were traveling.

**See** Commonwealth's Brief at 25-26.

The trial court concluded that the stop was pretextual, although it recognized such stops are proper when a valid traffic stop occurs. **See** Trial Court Opinion, 9/21/22, at 5-6. The court found the trooper illegally prolonged the stop because: 1) Trooper Konopka quickly checked Jaquez's documents, 2) "the mission of the stop ended after no more than ten minutes with nothing fruitful being uncovered to justify a further detention, with the exception that [Jaquez] and his passenger were not in agreement about the length of their relationship," and 3) the trooper continued to detain Jaquez without reasonable suspicion. **See id**. at 7-8. The court also found that Jaquez's limited command of English explained his initial delay in answering which of his relatives lived in Allentown. **See id**. at 8 n. 17. The court stated all of the additional information acquired **after** the mission of the stop had been completed cannot be considered in considering reasonable suspicion

- 11 -

because the continuing detention was for a drug investigation, not the traffic enforcement purpose of the stop. ***See id***. at 8-9.

We conclude the trial court did not abuse its discretion or commit an error of law although we affirm on a slightly different basis. ***See Commonwealth v. Troung***, 36 A.3d 592, 593 n.2 (Pa. Super. 2012) (*en banc*) (this Court may affirm the decision of a lower court for any proper reason). Based on the undisputed facts, we determine as a matter of law Trooper Konopka completed the mission of the stop approximately six minutes into the traffic stop, ***before*** he spoke to Yaritza, not after ten minutes as the trial court states. ***See Dunkins***, 263 A.3d at 252 (stating that this Court is not bound by trial court's conclusions of law). Within those six minutes, Trooper Konopka had told Jaquez he would receive a warning with no points, no fine, and nothing on his license "[a]s long as everything's good," ***see*** N.T., 4/20/22, at 22, Exhibit C-1 at 1:02-1:45, and, after running a computer check relating to the car, told Jaquez he was going to give him a warning, "no points, no fine, nothing goes on your license, okay?" ***See*** Exhibit C-1 at 4:12-4:20.[8] More important, by that point Trooper Konopka had completed the mission of the traffic stop. ***See Rodriguez***, 575 U.S. at 354; ***Ross***, 297 A.3d at 792.[9]

---

[8] Jaquez cites the trooper's testimony that he had confirmed the validity of the driver's license and the absence of warnings "within a minute." Jaquez's Brief at 21. The video shows that the check took longer than he asserts.

[9] The Commonwealth does not assert the existence of any attendant safety concerns that could have supported prolonging the traffic stop.

Because the mission of the traffic stop was complete (and in fact Trooper Konopka told Jaquez he would be free to leave with a warning), we assess whether the trooper developed the requisite reasonable suspicion during the mission of the traffic stop. By that time, Trooper Konopka had seen Jaquez's pattern of braking after passing the **unmarked** police SUV, noted Jaquez's car was newly registered and excessively tinted, found him vague about where he was going in Allentown, his travel arrangements, and the brevity of his trip, and observed Jaquez's alleged delay in naming his cousin and nervousness about where he was traveling. We find that the court correctly found these factors did not provide the trooper with reasonable suspicion to prolong the stop and his investigation. We agree with the court that Jaquez's delay in responding to the trooper's questions could be attributable to his lack of fluency in English, **see** Trial Court Opinion, 9/21/22 at 10, which substantially dispels any suspicion based on delayed responses. The new registration of the car does not add suspicion, even given the trooper's experience with the **re-registration** of cars by drug dealers. The car's excessive tinting supported a traffic stop as did Jaquez's speeding, but neither fact is sufficient, even when combined with all other factors known to the trooper at the time, to have permitted the officer to prolong the stop and engage in lengthy and far-reaching questioning of Jaquez and Yaritza. The pretextual nature of the stop was not improper, but the trooper failed to develop reasonable suspicion within the time during which he accomplished the mission of the traffic stop.

*See Dales*, 820 A.2d at 814 (finding that purpose of initial traffic stop for tinted windows ended when an officer confirmed that driver's paperwork was in order and issued a warning, and that suspicion arising from second round of questioning could not be considered in assessing reasonable suspicion). Here, authority for the seizure ended when the tasks related to the traffic infraction should have been completed. *See id.* We may not consider any subsequently developed suspicions resulting from the trooper's discussion with Yaritza. *See Ross*, 297 A.3d at 792; *cf*. *Chase*, 960 A.2d at 115, n.5 (permitting the consideration of additional suspicious facts that arise *before* a traffic stop's purpose has been fulfilled).

In its second issue, the Commonwealth asserts that Jaquez freely consented to the search of the car. The trial court stated that Jaquez's consent is only relevant if the trooper did not illegally prolong the traffic stop. It alternatively found the stop coercive based on Jaquez's limited fluency in English, the presence of another trooper, the absence of an express endpoint to the traffic stop, and the refusal to let Jaquez get out of the cold. *See* Trial Court Opinion, 9/21/22, at 9-13.

We do not reach the issue of whether Jaquez voluntarily consented to the search. The Commonwealth argued only that the trooper legally detained Jaquez and did not assert that the trooper illegally prolongation of the traffic stop did not affect the validity of Jaquez's consent. We agree with the trial court that the trooper illegally prolonged the stop and there was no break

- 14 -

between the illegal detention and the consent to search. Accordingly, Jaquez's consent to search was tainted by that illegality. ***See Commonwealth v. Lopez***, 609 A.2d 177, 182 (Pa. Super. 1992) (finding that a consent to search is tainted by an illegal detention and requires suppression of the evidence seized as the result of the search). We affirm the trial court's ruling and its suppression of the fruits of the illegally prolonged stop.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/19/2023