J-A12034-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SEKOU COOKE | : | |
| | : | |
| Appellant | : | No. 1525 EDA 2024 |

Appeal from the Judgment of Sentence Entered January 18, 2024
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0000114-2022

BEFORE:  STABILE, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:           **FILED SEPTEMBER 8, 2025**

Sekou Cooke ("Cooke") appeals from the judgment of sentence imposed following his non-jury conviction for persons not to possess firearms, carrying a firearm without a license, and carrying a firearm in public.[1]  Cooke claims suppression should have been granted because the body-worn camera of one officer contradicts another officer's testimony that he engaged in what appeared to be a drug transaction and renders inadmissible the evidence he had a gun when stopped.  Cooke also challenges the characterization the area where the transaction occurred as "high-crime."  Upon review, we affirm the trial court's conclusions that the officer did not give false testimony and the alleged "high-crime" character of the location of the transaction is irrelevant.

_____

[1] **_See_** 18 Pa.C.S.A. §§ 6105, 6106, 6108.

The Commonwealth presented the following testimony at the hearing on Cooke's motion to suppress.[2]  On November 4, 2020, at approximately 6:00 p.m., Officer Stephanie Fazio ("Officer Fazio") and her partner, Officer McConnell,[3] were conducting a narcotics surveillance of a corner store ("the Guchy store"), at 5015 North Broad Street, a locus of violent crime in a high-crime area.  *See* N.T., 11/13/23, at 7-8, 11, 35.  Officer Fazio had been a member of the Philadelphia Police Narcotics Enforcement team for nearly five years, participated in approximately 600 surveillances leading to 400 arrests, and had been the lead investigator on 200 of those cases, 30-40 in the surveillance area.  *See id*. at 10.  Officer Fazio saw a man in a green jacket and black pants standing outside the Guchy store with a group of other men; the group then went inside the store.  *See id*. at 15.

At 6:10 p.m., Cooke, who wore a pink hat, a tan hoodie, and blue jeans, entered the store and approached the man with the green jacket and black pants.  *See id*. at 15, 18.  Cooke gave the man U.S. currency in exchange for an unknown, small object.  *See id*. at 16, 21.  Cooke left the store; Officer Fazio radioed his description to a backup unit.  Officer Miller[4] told Officer Fazio he and his partner, later identified as Officer Shawn Bossert ("Officer

_____

[2] Cooke originally pled guilty, withdrew his guilty plea, then filed a suppression motion on which the trial court held a hearing.

[3] The certified record does not contain Officer McConnell's first name.

[4] The certified record does not contain Officer Miller's first name.

Bossert"), were pursuing a man matching Cooke's description. Officer Fazio saw Officer Miller chasing Cooke (who had run in a "U"-shaped pattern). Officer Fazio and Officer McConnell left the surveillance site during the pursuit of Cooke. *See id*. at 28. Officer Miller and other officers detained Cooke at a nearby gas station parking lot. *See id*. at 16-19. Officer Fazio testified that because the officers found a gun when they detained Cooke, a number of officers responded to that location, which left the police without an available officer to detain the man to whom Cooke gave U.S. currency. *See id*. at 22.

During his cross-examination of Officer Fazio, Cooke's counsel ("Counsel") played a video recording from Officer McConnell's body-worn camera, Exhibit C-7.[5] The video apparently shows officers detaining a man in a green jacket at the Guchy store and searching him at Officer McConnell's direction. Counsel asked Officer Fazio how this video evidence related to her testimony that the police had not arrested or charged a man in a green jacket, and suggested Officer Fazio gave contradictory testimony or withheld the "fact" the alleged seller was searched and had no drugs.[6] *See id*. at 27. Officer Fazio responded that the Commonwealth's question on direct

_____

[5] Cooke has failed to ensure the presence of the video in the certified record, so we utilize the suppression hearing testimony.

[6] Officer Fazio testified upon hearing the audio from Officer McConnell's body-worn camera that it recorded Officer McConnell directing the search of certain men in the store. *See id*. at 27. She testified she believed the seller had left the area before the search occurred. *See id*. There was no evidence showing where Officer Fazio was when Officer McConnell directed the search.

examination had been whether the *seller* had been arrested, to which she answered that she could not confirm that the *seller* had been arrested. *See id*. at 23, 27-28.[7] Officer Fazio testified her paperwork indicated the seller had "walked off when all that commotion was going on," and further that she and her partner had left the surveillance site at about the time Cooke fled. *See id*. at 27, 28.[8] Apparently commenting about what she saw on Officer McConnell's body-worn camera video, Officer Fazio testified Officer McConnell said to officers conducting a search, "They're all good" (meaning they had no drugs) about the people who had been searched. Officer Fazio restated her belief the seller had walked off prior to that search. *See id*. at 29.[9]

Officer Bossert testified that at 6:10 p.m., he and Officer Miller were on backup for plainclothes narcotics surveillance about two blocks from the gas station where Officer Miller later stopped Cooke. *See id*. at 33-35. Officers

---

[7] Officer Fazio testified that from her vantage point she could not see anything that happened in the back of the store. *See id*. at 23, 27-28.

[8] Officer Fazio testified, "[O]nce Officer Miller was in pursuit [of Cooke], we initially . . . drove across Broad Street, and [Cooke] was stopped, and then we leave the location. That's why I'm saying you never hear anyone say that yes, that was the seller. We usually positively ID someone before they're brought in. . . . There's no conversation about anyone being positively ID'ed as the seller, and I can't testify as to why this officer stopped the male." *Id*. at 28.

[9] Cooke's Brief asserts Officer Fazio was sitting in the surveillance vehicle with Officer McConnell as he directed the search. *See* Cooke's Brief at 21, n.4. There is no record evidence supporting that assertion.

Bossert and Miller received Officer Fazio's "flash" description of Cooke's distinctive clothing and saw Cooke within one minute. *See id*. at 36-37, 41. Officer Bossert testified that as they drove in Cooke's direction in their marked patrol car, Cooke looked their way and fled. *See id*. at 37. Officer Miller got out of the patrol car and chased Cooke; Officer Bossert briefly lost sight of the pursuit. *See id*. at 38. Officer Bossert testified that following a chase, Officer Miller detained Cooke and recovered a loaded Glock .22 from his waistband. *See id*. at 39-40.

Cooke testified at the hearing that as he walked on the street on the day of the incident, an officer gestured for him to approach, and then approached him. *See id*. at 52. Cooke testified he had not gone to the Guchy store but a different store nearby to use the ATM. *See id*. at 53. He testified he ran from the pursuing officer. *See id*. at 52. He denied discarding drugs but admitted he was in possession of a gun and said that was the reason he ran from police. *See id*. at 54-56.

At the conclusion of the hearing, the suppression court denied Cooke's motion and found Officer Fazio conducted a surveillance of the Guchy store and saw Cooke give money to a man in a green jacket in exchange for small objects, then summoned her backup unit as both men walked away after the transaction. *See id*. at 68-69. The court credited testimony that Cooke ran upon seeing Officer Bossert's police vehicle in a high-crime area, and found "of no moment" the fact that the police did not stop the man with whom Cooke

engaged in the transaction. *See id*. at 68-70. The court denied suppression concluding Cooke's hand-to-hand transaction provided the police with reasonable suspicion to stop him; Cooke's unprovoked flight in a high-crime area also independently provided the police with reasonable suspicion to stop him. *See id*. at 70-71.

Cooke proceeded to a negotiated, stipulated trial. The court accepted into evidence all the non-hearsay evidence as well as Commonwealth exhibits that established the recovery of a loaded Glock .22 from Cooke's waistband, the operability of that firearm, and Cooke's non-licensure to carry a firearm, based on his prior, disqualifying felony conviction. *See id*. at 82-86. The court convicted Cooke of the above-listed offenses. In January 2024, the court imposed a sentence of eight to sixteen years of imprisonment for persons not to possess firearms, and no further penalty for Cooke's other convictions. Cooke timely appealed and he and the trial court complied with Pa.R.A.P. 1925.

On appeal, Cooke raises three issues for this Court's review:

1. Did the [suppression] court err in denying the motion to suppress physical evidence, where the record, which included body-worn camera footage that contradicted officer testimony, failed to support the trial court's conclusions of fact regarding the basis for the seizure?

2. Is consideration of the "high-crime" character of the location of an arrest as a factor in establishing the basis for a seizure improper under the Pennsylvania Constitution?

3. Assuming that the level of crime in a given area is a proper consideration, did the Commonwealth fail to prove that the area of arrest was in fact a "high-crime area?"

Cooke's Brief at 2.

Cooke disputes the existence of reasonable suspicion, asserts the evidence contradicts the trial testimony the Commonwealth presented, challenges the viability of "high-crime area" caselaw and, alternatively asserts the Commonwealth failed to prove the arrest occurred in a high-crime area. We review these three interrelated issues together and determine them to be without merit.

The Commonwealth bears the burden at a suppression hearing of establishing the challenged evidence was not obtained in violation of the accused's rights. *See* Pa.R.Crim.P. 581(H). The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the suppression court. *See Commonwealth v. Dutrieville*, 932 A.2d 240, 242 (Pa. Super. 2007). A reviewing court conducts plenary review to determine if the court properly applied the law to the facts. However, the suppression court's factual findings bind an appellate court so long as they are supported by the record. *See Commonwealth v. Saunders*, 326 A.3d 888, 894 (Pa. 2024); *Commonwealth v. Dales*, 820 A.2d 807, 812 (Pa. Super. 2003). This Court may reverse if the suppression court drew erroneous legal conclusions from the evidence. *See Commonwealth v. Dunkins*, 263 A.3d 247, 252 (Pa. 2021).

There are three types of encounters between the police and citizens: (1) mere encounters, which carry no official compulsion to stop or respond, (2)

investigative detentions, which are temporary unless they result in the formation of probable cause and do not possess the coercive conditions of a formal arrest, and (3) custodial detentions, where the nature, duration, and conditions of an investigative detention "become so coercive [] as to constitute the functional equivalent of an arrest." ***Commonwealth v. Spence***, 290 A.3d 301, 314 (Pa. Super. 2023) (citation omitted).

In reviewing whether reasonable suspicion exists, this Court examines the totality of the circumstances to determine if there exists "a particularized and objective basis for suspecting an individual of criminal activity." ***Commonwealth v. Knupp***, 290 A.3d 759, 767 (Pa. Super. 2023) (citation and brackets omitted). To establish reasonable suspicion, an officer "must articulate specific observations which, in conjunction with reasonable inferences derived from these observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot." ***Commonwealth v. Garcia***, 311 A.3d 1138, 1145 (Pa. Super. 2024) (citation omitted). ***See Alabama v. White***, 496 U.S. 325, 329 (1990) (quoting ***Terry v. Ohio****,* 392 U.S. 1, 22 (1968) (stating a police officer has reasonable suspicion when he is "able to articulate something more than an 'inchoate and unparticularized suspicion or hunch'" that criminal activity is afoot)); ***accord Commonwealth v. Hughes***, 908 A.2d 924, 927 (Pa. Super. 2006).

Although reasonable suspicion requires something more than an observation of a person doing something many people can do legally, ***see***

*Garcia*, 311 A.3d at 1145, the likelihood of criminal activity sufficient to establish reasonable suspicion "falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Even a combination of innocent facts, when taken together, may warrant further investigation by the police officer. *See Commonwealth v. Harris*, 176 A.3d 1009, 1021 (Pa. Super. 2019). *See also Arvizu*, 534 U.S. at 277 (stating that reasonable suspicion "need not rule out the possibility of innocent conduct"); *see also Garcia*, 311 A.3d at 1145 (stating that "[w]ithout any possibility of innocence, there would be nothing for the officer to investigate"). A court assessing reasonable suspicion considers the totality of the circumstances giving due weight to the specific reasonable inferences the police officer is entitled to draw from the facts considering her experience. *See Harris*, 176 A.3d at 1021.

Unprovoked flight in a high-crime area is sufficient to establish reasonable suspicion under the Fourth Amendment, *see In re D.M.*, 781 A.2d 1161, 1164 (Pa. 2001), which is coterminous with federal law, *see In re D.M.*, 781 A.2d at 1163; *Commonwealth v. Barnes*, 296 A.3d 52, 58-59 (Pa. Super. 2023).

Cooke asserts Officer Fazio falsely testified no officer was available to stop the man with the green jacket and black pants. He asserts video evidence shows officers searched a man wearing a green jacket and did not find drugs and Officer Fazio concealed that search. *See* Cooke's Brief at 12, 15-25.

Cooke additionally declares video evidence is more reliable than testimony. *See id*. at 13-15, citing *Scott v. Harris*, 550 U.S. 372 (2007); *Commonwealth v. Griffin*, 116 A.3d 1139 (Pa. Super. 2015).

Cooke disputes the suppression court's reasoning that, even if Officer Fazio's testimony were disregarded, his unprovoked flight in a high-crime area would establish reasonable suspicion, and claims the Commonwealth failed to prove he fled in a high-crime area. *See* Cooke's Brief at 25-33.[10] Finally, Cooke asserts the testimony of two officers that the stop took place in a high-crime area did not suffice to establish that as a fact. *See id*. at 29-33.

The suppression court found the police had reasonable suspicion supporting an investigative detention of Cooke. It determined Officer Fazio's observation as a seasoned narcotics officer of Cooke's hand-to-hand transaction of cash for a small object provided reasonable suspicion for her backup officers to investigate Cooke. *See* N.T., 11/13/23, 70; Trial Court Opinion, 7/22/24, at 8. It found an independent basis of reasonable suspicion because Cooke, who matched the flash information of a man wearing a pink

_____

[10] To support his position, Cooke cites two cases in which the Pennsylvania Supreme Court has granted *allocatur* to consider the nature of "high crime area" evidence and its relevance the assessment of reasonable suspicion, although he acknowledges this Court is not free to reach a conclusion contrary to existing Supreme Court precedent. *See id*. at 29. In addition to this Court's lack of authority to contradict Supreme Court precedent, the grant of *allocatur* does not establish the Supreme Court's intention to change the law regarding high-crime areas.

hat, a tan jacket or hoodie, and blue jeans, undertook unprovoked flight in a high-crime area when he saw a marked patrol car. **See** Trial Court Opinion, 7/22/24, at 8.

The court did not err when it found reasonable suspicion existed to stop Cooke. An experienced officer saw what she believed to be a drug sale in a high-crime area. **See Harris**, 176 A.3d at 1021. Additionally, Cooke later fled unprovoked in a high crime area when he saw a patrol car. **See Commonwealth v. Clemens**, 66 A.3d 373, 380 (Pa. Super. 2013) (finding reasonable suspicion existed where an experience officer saw what he believed was a hand-to-hand narcotics transaction in a high-crime area and the suspect then fled when he saw the officer).

That the police did not detain a dealer with drugs and Cooke did not have drugs on his person when stopped, does not defeat the existence of reasonable suspicion to stop Cooke. The experienced officer here had a reasonable basis for her suspicion the payment of money for a small object was a drug sale. Even if Cooke could demonstrate no drug sale occurred, that would not defeat the officer's reasonable suspicion to conduct an investigative detention. **See Harris**, 176 A.3d at 1021 (stating a combination of innocent facts, when taken together, may warrant further investigation). **See also Arvizu**, 534 U.S. at 277 (stating reasonable suspicion "need not rule out the possibility of innocent conduct").

Cooke's speculation concerning what occurred regarding the man in the green jacket police later searched at the scene of the observed transaction does not change this result. Cooke provides no proof the man police searched was the same man with whom Cooke had the transaction – as the Commonwealth notes, more than one man may have a green jacket. Further, if it was the same man, he might have sold Cooke the only drugs he had on his person. Moreover, assuming *arguendo*, the man the police searched **was** the seller, that would not prove Officer Fazio lied about the transaction she saw. It may be, for instance, that Cooke bought the last portion of drugs the man had on his person to sell.

Next, Cooke's case citations concerning video evidence are inapposite. This is not a case where a video captures a criminal event an officer describes and renders the officer's testimony impossible or unworthy of belief. **See Scott**, 550 U.S. at 379-80 (finding video which showed suspect drove shockingly fast in flight from police officers and imperiled others directly contradicted appellate court's finding that suspect posed little, if any, actual threat to others; suspect's version of events "is so utterly discredited by the record that no reasonable jury could have believed him"); **Griffin**, 116 A.3d at 1143 (holding video of police manipulating object in suspect's pocket discredited officer's testimony it was immediately apparent an object was contraband). Rather, there are various plausible explanations why the search of a man in a green jacket did not result in the discovery of drugs. Counsel's

intemperate assertion Officer Fazio gave false testimony, ***see*** Cooke's Brief at 12, has no merit.[11]

Because we find no merit to Cooke's assertions, we affirm the denial of his suppression motion and his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/8/2025

_____

[11] Finally, whether Cooke's actions occurred in a high-crime area is irrelevant given Cooke's flight after the observed transaction. ***See Commonwealth v. Walls***, 53 A.3d 889, 894-95 (Pa. Super. 2012) (holding unprovoked flight, in a non-high-crime area, creates reasonable suspicion where fleeing suspect matches flash description in the proximity of the flash location).